GUTOR INTERNATIONAL AG,
Plaintiff, Appellee,

v.

RAYMOND PACKER CO., INC.,
Defendant, Appellant.

No. 73–1133.

United States Court of Appeals,
First Circuit.

Argued Oct. 4, 1973.

Decided March 22, 1974.

Arnold Manthorne, Boston, Mass., with whom Warner & Stackpole, Boston, Mass., was on brief, for defendant, appellant.

Shepard M. Remis, Boston, Mass., with whom Herrick, Smith, Donald, Farley & Ketchum, Boston, Mass., and Casey, Lane & Middendorf, New York City, were on brief, for plaintiff, appellee.

Before COFFIN, Chief Judge, MOORE* and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Gutor International AG (Gutor), a Swiss corporation, brought a diversity action in the District of Massachusetts to recover the agreed price of 500 Ultravox dictating machines shipped to Raymond Packer Company, Inc. (Packer), a Massachusetts concern. Packer admitted that it had ordered and accepted the machines, but interposed defenses and two counterclaims. In one counterclaim Packer sought damages for Gutor's alleged breach of an agreement making Packer the exclusive distributor in the United States for Ultravox machines. The other charged Gutor and Dictaphone International AG (Dictaphone), a wholly-owned subsidiary of Dictaphone Corp. (Dictaphone US), a Michigan corporation and a major American manufacturer of dictating equipment, with creating an international monopoly in dictating equipment, allocating territories, and refusing to deal with Packer, all in violation of the antitrust laws. Treble-damages were sought.

Gutor moved for summary judgment, which the district court granted. We affirm as to the action for the price of goods sold and delivered, but reverse and remand on both of Packer's counterclaims.

From affidavits and the results of discovery proceedings, the following appears: On July 1, 1964, the Raymond Packer Company (the Packer firm), a proprietorship and the predecessor of Packer, entered into a written contract (the Agreement) with Direma Ltd. (Direma), a Swiss corporation which then manufactured and controlled the rights to Ultravox dictating machines. Described therein as agents, the Packer firm was to be Direma's sole outlet and distributor in the United States. The Packer firm bound itself not to deal in competing products, to serve Direma faithfully as agents, to endeavor to extend the sale of the machines, and not to sell outside the United States. The Agreement automatically renewed itself for three year periods,[1] prohibited assignment without written consent,[2] pro-

---

* Of the Second Circuit sitting by designation.

1. Paragraph 21 of the Agreement provided: "The Agreement hereby constituted shall be effective on first July 1964 and remain in force until 31st December 1967. It will be renewed automatically for successive periods of three years and can be terminated only if either of the contracting parties make default in the observance of any of the terms stipulated in the present Agreement . . ."

2. Paragraph 18 of the Agreement provided: "The rights and obligations of the contracting parties resulting from the present Agreement may be transferred to third parties only with the official and written consent of the other contracting party."

vided for termination on one month's notice for default in observance of any of its terms,[3] provided for damages for breach,[4] and specified that the Agreement would be construed in accordance with Swiss law and that all "disputes arising between the contracting parties" would be referred to arbitration in Zurich.[5]

In February, 1965, Direma sold its Ultravox manufacturing, trademark and marketing rights to Gutor. The Packer firm did not grant formal permission to transfer the rights under the Agreement, but in December, 1964, Direma's managing director advised Mr. Packer of the impending sale, and Mr. Packer did not object. In February Gutor itself notified the Packer firm that it would henceforth transact Ultravox business in Direma's stead. It invited the Packer firm's continued "close contact". Thereafter, without complaint, the Packer firm bought Ultravox products from Gutor. In May, 1965, responding to a letter from the Packer firm Gutor wrote confirming "herewith that you have been entrusted with our agency in July 1964 and that you are the exclusive and only importer of our dictating equipment for the United States." Gutor directed a potential customer to "our own agents in your territory", to wit the Packer firm, and treated Packer[6] as its exclusive agent until March, 1968.

In December, 1965, Gutor wrote Packer thanking it for its efforts and for sending an employee to its location in Switzerland for vocational training. Gutor went on,

"In view of the fact that in spite of your efforts you did not succeed in importing the 2700 machines, fixed *in our agency agreement,* we would like to discuss all questions which might contribute to achieve the fixed number of minimum 3600 dictating machines for 1966." [Emphasis supplied.]

The letter referred to an addendum to the 1964 Agreement binding the Packer firm to purchase at least 700 machines in 1964, 2700 in 1965, and 3600 in 1966 and thereafter (subject to adjustment). Packer in fact bought only 342 in 1964, 1150 in 1965, 2080 in 1966 and 503 in 1967.

On October 25, 1967, Packer wrote Gutor ordering 1000 Ultravox machines, stating that the terms of cost and payment were to be "the same as on our last purchase of one thousand machines,"[7] Gutor thereafter shipped 500 machines, but Gutor's Managing Director, Schmidt, while thanking Packer for the order stated that the terms would have to be "Whole amount payable without discount, against shipping documents, . . ."

3. Paragraph 20 of the Agreement provided: "If any party violates any of the terms of the present Agreement, the party in opposition may give notice . . . to terminate the Agreement . . ., and one month after the date of such notice the Agreement . . . shall cease, provided notice is given immediately after the violation of the Agreement has been discovered."

4. Paragraph 19 of the Agreement provided: "If either party makes default . . . the other party will be entitled to claim a penalty for each violation . . . . In addition, the violated party [sic] will have the right to claim from the fallible party an indemnity for any damage . . . ." The "penalty" referred to could have been as high as the profit made from the violation, and the indemnity was to be an additional recovery.

5. Paragraph 23 of the Agreement provided: "This Agreement shall take effect and be construed in all respects in accordance with the laws of Switzerland, and in the event of any dispute or difference arising between the contracting parties as to the meaning or effect of this Agreement, the same shall be referred by the parties to Zurich, as the Seat of Jurisdiction. All disputes arising between the contracting parties will be finally resolved by a Court of Arbitration based on the Zurich Code of Civil Procedure." [Emphasis deleted.]

6. On December 26, 1965, the Packer firm incorporated, transferring its assets to the present defendant, Packer. Neither Direma nor Gutor consented in writing to a transfer of rights under the Agreement.

7. These allowed credit, with the first 50% of the price due 20 days after delivery.

Packer registered strenuous disapproval of the proposed change. Gutor replied that "no other agent" had ever had such "rock bottom prices and terms". Gutor chided Packer for failing to meet its sales "target", and denied promising the terms Packer wanted.

Packer's next letter, of December 9, voiced a fear that Gutor had become intransigent over terms because it was planning to replace Packer as its agent, and inquired why two new model Ultravox machines had been sent to the New York office of Royal Typewriter rather than to Packer. Packer said that it had in the past three weeks stopped advertising and decided not to hire two new salesmen. "You can understand that with no possible future, I have no interest".

There was further recrimination and expostulation. Gutor elaborated upon Packer's alleged failure to sell in adequate volume. It explained that the machines were in Royal's office because Gutor might license Royal to manufacture in the United States. Meanwhile Packer, by letter of January 17, 1968, flatly declined to accept the machines, which had by then arrived, unless the terms were "as were stated on the purchase order and as previously". Packer also demanded written assurance "as to the future", stating that it had lost money, and blaming its low volume on defects in the machines.

On January 29, 1968, Gutor notified Packer that it reluctantly agreed to the terms of payment and Packer, without waiting for assurances, accepted delivery of the 500 machines. It did not, however, pay for them, and has refused payment to date.

Although Gutor never gave express assurances, as late as February 26, 1968, it continued to notify (with copy to Packer) persons making inquiry that Packer was its exclusive U.S. sales agent. It was, however, in secret negotiation with Dictaphone, and in March 1968 announced arrangements for Dictaphone to acquire Gutor's Ultravox business. In its letter of March 20, 1968, to Packer enclosing an announcement circular, Gutor contrasted Packer's 1968 plans to sell 3600 machines with its "meagre results"—500 machines—in 1967. Nothing was said about the future of Packer's agency, and Packer's president states that he waited hopefully until May for word from Dictaphone. Thereafter, as a result of his own inquiries, he learned that Dictaphone had no plans to include Packer in its distribution network of an improved Ultravox line and declined, indeed, to supply even spare parts to Packer except at retail prices. Certain other Ultravox dealers abroad were, however, retained.

Dictaphone US has since that time been the sole Ultravox dealer in the United States. Neither Dictaphone, Dictaphone US, nor Gutor has sold any Ultravox machines or parts to Packer except as a retail customer. Dictaphone US solicited Packer's former dealers and customers, apparently using customer lists supplied by Packer to Gutor.

After it had become clear that Packer could not obtain machines or parts from Gutor or Dictaphone, Packer contacted Direma, which was still the Swiss distributor of Ultravox. Direma declined to supply any machines or parts on the ground that this would violate the territorial restrictions in, and lead to loss of, its own distributorship. Following this refusal Efrem A. Gordon, then attorney for Packer, wrote to Direma on September 5, 1968, claiming that Direma was still bound under the 1964 Agreement because assignment required written consent, which was never given, and that Direma would have to supply parts or be liable for breach.

On March 2, 1971, Gutor brought the instant action for the price of the 500 machines. Packer filed its answer and counterclaims for breach of the Agreement and antitrust violations. Summary judgment was entered for Gutor on all issues, and this appeal followed.

## I

The district court correctly entered summary judgment against Packer for

the price of the delivered machines. F. R.Civ.P. 56. Packer accepted them and was liable at the contract rate. M.G.L. c. 106, § 2–607(1).

In defense, Packer attempted to show that purchasing the machines was so bound up with the future of its Ultravox franchise that cancellation of the latter entitled Packer to withhold payment. The point is not entirely specious. Discontinuance of the distributorship might well have left Packer without incentive or means to sell and service the machines. Indeed, Packer might not have accepted them if it had known of Gutor's concealed plans. However, after Packer learned that it was no longer an Ultravox distributor, it never took timely action to revoke acceptance and hold or dispose of the machines for Gutor's account. §§ 2–608, 2–610. *See* §§ 2–602, 2–603, 2–604. *Cf.* § 2–701 (official comment); § 2–106(2) (official comment 2). Alternatively it never gave timely notice to Gutor of an election to offset damages allegedly stemming from the distributorship termination directly against Gutor's claim for the price. § 2–717; *see* § 2–714. By failing to take appropriate action Packer forfeited whatever right, or claim of right, it might have had under the Uniform Commercial Code to treat Gutor's alleged breach as a defense to nonpayment.

Packer's resort to § 2–609 is of no avail. It provides, in part, that

"When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance *for which he has not already received the agreed return.*" [Emphasis supplied.]

The italicized words are fatal to Packer's argument. Section 2–609 might have permitted Packer to discontinue marketing efforts until Gutor assured continuation of its agency. Packer might even have declined to accept the machines while waiting for assurances. But § 2–609 does not terminate liability to pay for goods once in hand; it merely authorizes an insecure party to withhold possibly costly advance performance when the agreed return is in doubt.

Packer's final argument against Gutor's recovery of the price of the machines is that it should not be compelled to pay in Swiss currency or its equivalent as of the payment date. It contends that it should pay in the equivalent of Swiss currency valued as of February 19, 1968, when the contract was allegedly broken. Packer adds that the district court treated it unfairly by deciding the point without further hearing. This latter argument is frivolous. Gutor in its complaint requested recovery "in the amount of sFr. 161'625.00, or the equivalent therefor in United States dollars computed at the official exchange rate existing on the date of judgment . . . ." Packer did not contest the price and terms. If Packer believed that damages should be computed as of some date prior to the date of judgment, it should have made the point before or at the hearing on the motion for summary judgment. After judgment, if it wished to pursue the matter, Packer should have timely moved to alter or amend the judgment under Rule 59(e).[8]

Gutor relies on the rule that when a debt is payable in foreign currency in a foreign country the proper date of conversion is the judgment or payment date and not the date on which the obligation arose. Deutsche Bank Filiale Nurnberg v. Humphrey, 272 U.S. 517, 519, 47 S.Ct. 166, 71 L.Ed. 383 (1926); Reissner v. Rogers, 107 U.S.App.D.C. 260, 276 F.2d S.Ct. 47, 5 L.Ed.2d 47 (1960). The 506, 511, cert. denied, 364 U.S. 816, 81 record is consistent with Gutor's assertions and the court's ruling. To the extent Packer was without later opportuni-

---

8. Packer first raised the issue on a motion, made 52 days after the entry of judgment, to reduce the amount of the supersedeas bond.

ty to persuade the court that payment was to be in the United States, thus possibly giving rise to a different rule, the fault was its own. We affirm the district court's judgment on Gutor's claim.[9]

## II

■ But the district court erred in its dismissal of Packer's two counterclaims. Neither Gutor's alleged breach of its obligations under the Agreement nor its alleged involvement in an antitrust conspiracy are proper defenses, as the district court correctly perceived. However, F.R.Civ.P. 13(c) provides that a counterclaim *"may or may not* diminish or defeat the recovery sought by the opposing party. It may claim relief exceeding in amount or different in kind from that sought in the pleading of the opposing party." [Emphasis supplied.] Whatever its estimate of the defensive merits of the counterclaims, the court was obliged to view each as a separate cause of action,[10] and to grant Packer its right to trial if there was "the slightest doubt as to the facts." Peckham v. Ronrico Corp., 171 F.2d 653, 657 (1st Cir. 1948). Summary judgment is not to be a trial by affidavit. Walgren v. Howes, 482 F.2d 95, 98 (1st Cir. 1973).

■ The counterclaim for breach of the 1964 Agreement presents the issues whether Direma's rights and obligations were assigned by Direma to Gutor and, if so, whether Packer and Gutor became mutually bound by its terms. The outcome depends largely on inferences to be drawn from documents and the course of dealings between the parties. Packer is entitled to establish its side through testimony as well as documentary evidence. It was not bound to prove its case at the hearing on summary judgment. It only had to show, which it did, that it possibly had a case.

> "On summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

*Cf.* Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 472–473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). Although the Agreement provided that the rights and obligations of a contracting party could not be transferred without the written consent of the other contracting party, such a provision, at least under American law, is for the benefit of the obligor and may be waived by him, and a waiver may be inferred from the conduct of the parties. 4 A. Corbin, Contracts § 870 at 476; § 873 at 496 (1951). Packer's uncomplaining acceptance of Gutor in place of Direma, the relationship that evolved with Gutor in 1965 and thereafter, and the wording of certain letters lends support to Packer's contentions of assignment of the Agreement and waiver of the "written consent" requirement. Moreover, the letters indicate at the very least that Gutor established and treated Packer as its exclusive U. S. agent, perhaps giving rise to an alternative claim, upon a theory of equitable estoppel or implied or quasicontract, for any actual damages caused

***

9. In view of our decision, *infra,* as to Packer's counterclaims and in view of the possible difficulties Packer may face collecting any judgment on its counterclaims against Gutor, we grant leave to the district court to stay enforcement of the presently outstanding judgment on Gutor's claim pending further proceedings. *See* F.R.Civ.P. 62(h). We are not to be understood as intimating that enforcement should necessarily be stayed, but leave the decision as to what is most just and equitable to the discretion of the district court.

10. As to the first counterclaim, in which Packer seeks damages for breach of the distributorship agreement, the court focussed upon its belief that the counterclaim was "a mere sham to avoid paying a lawful contract." But assuming it was not a valid defense, the question remained whether the counterclaim stated an independent cause of action and whether there were material issues of fact as to which Packer was entitled to a trial. The court, of course, retained power under Rule 13(i) to order separate trials and judgments so as to avoid inequitable delay, should that have been a problem.

by unfair termination, if such should be found to have taken place. *See, e. g.,* Robie v. Ofgant, 306 F.2d 656 (1st Cir. 1962); Jack's Cookie Co. v. Brooks, 227 F.2d 935 (4th Cir. 1955), cert. denied, 351 U.S. 908, 76 S.Ct. 697, 100 L.Ed. 1443 (1956). 1 A. Corbin, Contracts, §§ 18, 19 (1963).

We find no merit in Gutor's contention that the September 5, 1968, letter to Direma by Packer's former attorney is a binding repudiation by Packer of any rights it may have against Gutor. The letter merely states legal contentions advanced by Packer's attorney, at a time after the present controversy arose, when Packer, denied spare parts by Gutor and Dictaphone, was seeking assistance from any hopeful quarter. It does no more than assert Direma's continued liability. Packer might be able to establish, in certain circumstances, both that Gutor was bound and Direma not yet released. 4 A. Corbin, Contracts §§ 870, 873, 890 (1951). It is not clear that the letter is entitled to any weight whatever. It is certainly not sufficient support for summary judgment against Packer's counterclaim.

▇▇▇▇ Should the district court determine that Gutor was bound under the Agreement, the question arises whether Packer's claim must be submitted to a Swiss Court of Arbitration. Under the Agreement "[a]ll disputes arising between the parties" are to be so "finally resolved". But arbitration may be waived by the conduct of a demanding party. Ferber Co. v. Ondrick, 310 F.2d 462 (1st Cir. 1962), cert. denied, 373 U. S. 911, 83 S.Ct. 1300, 10 L.Ed.2d 412 (1963). While the "vigorous policy favoring arbitration" discourages a too-ready finding of waiver, Hilti, Inc. v. Oldach, 392 F.2d 368 (1st Cir. 1968), we think Gutor, having submitted unconditionally to the United States courts its claim for payment for machines sold to Packer under arrangements then in force between the two, may not now take advantage of the arbitration clause to urge judicial abstention to the prejudice of Packer. *Cf.* Dickstein v. duPont, 443 F.2d 783 (1st Cir. 1971); Kulukundis Shipping Co. v. Amtorg Trading Corp., 126 F.2d 978, 989 (2d Cir. 1942).

▇▇▇▇ Should the 1964 Agreement turn out to apply, Gutor's claim for payment would itself appear to be arbitrable under the broad if somewhat indefinite language of the Agreement; the general policy favoring arbitration leads to a no-less inclusive reading of the arbitration clause.[11] Submission of part of an arbitrable matter to a court waives the submittor's right to insist upon arbitration of the remainder.

▇▇▇▇ Moreover, practically and equitably, Packer's claims based upon Gutor's unceremonious termination of the distributorship cannot be divorced from the question of Gutor's right to be paid. Fairness to Packer dictates that both questions—payment for the machines and damages, if any, for termination of the distributorship—be litigated in the same forum. If there is anything to Packer's claim it would be unconscionable for Gutor to utilize our courts to collect its moneys while Packer is left to an uncertain Swiss remedy. Gutor brought suit in the District of Massachusetts and has insisted upon its right to relief here. Except for raising arbitration as a defense to Packer's counterclaim, it has never itself proposed to arbitrate the matter of payment even were it to be found that Gutor was bound by the Agreement. While the question is a close one, we think that Gutor has waived its right to demand arbitration, and must be content to leave the fortunes of the entire litigation in the hands of the tribunal of its first choice.

---

11. Hussey Metal Division v. Lectromelt Furnace Division, 471 F.2d 556 (3d Cir. 1972); Coenen v. R. W. Pressprich & Co., Inc., 453 F.2d 1209 (2d Cir.), cert. denied, 406 U.S. 949, 92 S.Ct. 2045, 32 L.Ed.2d 337 (1972). Arbitrability is not destroyed by the one-sidedness of the action for the price, *see* Trailways of New England, Inc. v. Amalgamated Ass'n of Street, Electric Ry. & Motor Coach Employees of America, AFL–CIO, Div. 1318, 353 F.2d 180 (1st Cir. 1965).

*Cf.* Ferber Co. v. Ondrick, 310 F.2d 462, 464–465 (1st Cir. 1962), cert. denied, 373 U.S. 911, 83 S.Ct. 1300, 10 L.Ed.2d 412 (1963). All related matters, including Packer's possible claim in quasi-contract as well as its antitrust counterclaim, will be dealt with together in unified proceedings in one forum.

If upon remand, therefore, the court should decide that Gutor was bound by the Agreement (or by an equitable estoppel or implied contract) all remaining issues, including but not limited to such questions as whether Gutor violated any legally binding undertaking, whether Packer was harmed, and the damages, if any, to which Packer is entitled, shall, unless the parties otherwise agree, be decided by the district court. The effect and meaning of the Agreement would apparently, under its terms, be construed in accordance with the laws of Switzerland, but we leave to the district court the conflict of law questions that may arise. Needless to say, our comments touching upon the merits are merely for the purposes of summary judgment; whether Packer prevails on either of its counterclaims will depend on what it is able to prove at trial and may turn, as well, on legal issues not here considered or resolved.

### III

The district court ruled that summary judgment on Packer's antitrust counterclaim was required because "antitrust violations, as a defense to a contract for goods sold and delivered, will not be . . . proper . . . unless the issue of the illegality of the contract is directly involved." Its conclusion is cor-rect only if an antitrust cause of action stated in a permissive counterclaim is tantamount to an antitrust defense. *See* Kelly v. Kosuga, 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959).

The antitrust "defense" dealt with in *Kelly* was an allegation that the antitrust violation made the contract illegal and unenforceable. By such a defense, a party might maneuver an antitrust violation that cost him little or nothing into a right to avoid payment of a substantial debt. There is an overriding policy, in Justice Holmes' phrase, of "preventing people from getting other people's property for nothing when they purport to be buying it." Continental Wall Paper Co. v. Louis Voight & Sons Co., 212 U.S. 227, 271, 29 S.Ct. 280, 296, 53 L.Ed. 486 (1909) (dissenting opinion). Only "where the judgment of the Court would itself be enforcing the precise conduct made unlawful by the Act" is an antitrust defense allowed. Kelly v. Kosuga, *supra*, 358 U.S. at 520, 79 S. Ct. at 432; Associated Press v. Taft-Ingalls Corp., 340 F.2d 753 (6th Cir.), cert. denied, 382 U.S. 820, 86 S.Ct. 47, 15 L.Ed.2d 66 (1965).

On the other hand, a permissive counterclaim "is tantamount to an independent action, separately cognizable from the opposing party's claim . . . ." 3 J. Moore, Federal Practice ¶ 13.23 (1972). The policy of the federal rules favors resolving all disputes between the parties in a single litigation, *cf.* Montecatini Edison, S.P.A. v. Ziegler, 486 F.2d 1279, 1282 (D.C.Cir.1973). While there has been a split of authority, with some courts approving [12] and

---

12. Hartford-Empire Co. v. Glenshaw Glass Co., 47 F.Supp. 711 (W.D.Pa.1942); American Car & Foundry Inv. Corp. v. Chandler-Groves Co., 2 F.R.D. 85 (E.D.Mich.1941); Brown Paper Mill Co. v. Agar Mfg. Corp., 1 F.R.D. 579 (S.D.N.Y.1941); Stewart-Warner Corp. v. Universal Lubricating Systems, Inc., 29 F.Supp. 846 (W.D.Pa.1939). *Cf.* Mercoid Corp. v. Mid-Continent Investment Co., 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376

(1944) (appears to allow private treble damages claim in counterclaim; permissive counterclaim not barred in a second suit.) All these cases preceded *Kelly.* For later cases *see* Lanier Business Products v. Graymar Co., 342 F.Supp. 1200, 1203 (D.Md. 1972) (not discussing *Kelly*); Alaska Barite Co. v. Freighters Inc., 54 F.R.D. 192, 195 (N.D.Cal.1972) (would not "extend" *Kelly* to counterclaims).

others rejecting [13] the antitrust counterclaim, we think that the considerations expressed in *Kelly* and in our recent decision of Dickstein v. duPont, 443 F.2d 783 (1st Cir. 1971), do not justify outlawing antitrust counterclaims.

In *Kelly* the Court emphasized the undesirability of relieving from contractual obligations a party who may have sustained only inconsequential damage from the antitrust violation. That reasoning does not carry over to counterclaims, because the counterclaimant must prove damages just as in an independent action.

The *Kelly* Court also feared that allowing an antitrust violation to constitute a defense to a private contract would, by adding still another weapon to the arsenal, reach beyond what Congress would desire in a rational system of antitrust enforcement, *see* R. Posner, Economic Analysis of Law § 25.3 (1973). When Congress has delineated the remedies available, courts hesitate to create new ones. Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967). Again, however, this consideration is relevant only to antitrust defenses. A party bringing an antitrust counterclaim is requesting one of the remedies—treble damages for demonstrated loss—provided by Congress. The remedy is not enhanced by the claim's status as counterclaim rather than a separate suit.

In Dickstein v. duPont, *supra*, we expressed concern not to "prolong and complicate" contract disputes, and not to discourage plaintiffs by the threat of complex and costly antitrust litigation. However, antitrust counterclaims need do neither. Contract litigation need be prolonged and complicated only if the antitrust claim is permitted as a defense by way of avoidance.[14] When the antitrust cause is independently advanced as a counterclaim the contract action can proceed unimpeded, leaving the antitrust claim to be litigated in an appropriate fashion. Depending on circumstances, the court may order joint or separate trials and may advance the contract claim for immediate decision if it thinks best. Rules 13(i), 42(b) and 54(b). Similarly, although defendants may be able to make a credible threat to interpose a costly antitrust counterclaim, they may also threaten to file an independent action in antitrust if the other party brings an action in contract. The opportunity to bring the claim as a counterclaim does not usually increase the severity of the threat. In the instant case, however, the claim against Gutor was possible only because Gutor, a foreign entity, appeared in the jurisdiction to bring its suit on the contract. Even though in similar cases meritorious contract claims might be deterred, we believe that

"The plaintiff having, by his voluntary act in demanding justice from the defendant, submitted himself to the jurisdiction of the court, there is nothing arbitrary or unreasonable in treating him as being there for all purposes for which justice to the defendant requires his presence."

Adam v. Saenger, 303 U.S. 59, 67–68, 58 S.Ct. 454, 458, 82 L.Ed. 649 (1938). *See* General Electric Co. v. Marvel Rare Metals Co., 287 U.S. 430, 53 S.Ct. 202, 77 L. Ed. 408 (1932).

---

13. Ford Motor Co. v. Strickland, 302 F.Supp. 154 (S.D.Ga.1969); Barnsdall Refining Corp. v. Birnamwood Oil Co., 32 F.Supp. 314 (E.D.Wis.1940). *Cf.* Connolly v. Union Sewer Pipe Co., 184 U.S. 540, 551, 22 S.Ct. 431, 46 L.Ed. 679 (1902).

14. Or if the parties demand a recalculation of the price, *see* Siegel v. Chicken Delight, Inc., 448 F.2d 43 (9th Cir. 1971), cert. denied, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972); Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc., 365 F.Supp. 235 (C.D.Cal.1972) (Mr. Justice Clark).

Finally, while the courts should not create antitrust remedies not sanctioned by Congress, neither should they facilitate avoidance of the antitrust laws. Sobel, Antitrust Defenses to Contract Actions: A Question of Policy Priorities, 16 Antitrust Bull. 455 (1971). Packer appears to have stated a cause of action in antitrust [15] but will be unable to litigate it except as a counterclaim.[16] We see no reason to facilitate the collection of Gutor's own claim while relieving Gutor of normal accountability for antitrust violations, if any. We hold that the antitrust counterclaim is maintainable.[17]

Since the district court granted summary judgment on the antitrust counterclaim solely on its interpretation of *Kelly,* all alternative grounds of summary judgment remain open and we express no opinion on them.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. Pursuant to footnote 9, ante, enforcement of Gutor's judgment is stayed until further order of the district court.

15. Packer alleges that Dictaphone's acquisition of Ultravox rights eliminated Ultravox as a United States competitor of Dictaphone US; this appears to state a claim of attempting to monopolize and of decreasing competition by horizontal merger. Such claims may be tenable even though the market shares involved are extremely small. *See* Stanley Works v. FTC, 469 F.2d 498 (2d Cir. 1972), cert. denied 411 U.S. 928, 93 S.Ct. 2750, 37 L.Ed.2d 155 (1973). Packer has also presented a claim of concerted refusal to deal, a per se violation, *see* Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), and of division of the market, usually illegal under United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed. 2d 1249 (1967) and United States v. Topco Associates, Inc., 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). *But cf.* White Motor Co. v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963). Conspiracies between American and foreign companies to divide markets, even though they involve foreign products, may violate

our antitrust laws. Timkin Roller Bearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951). *Cf.* Graham, Hermann & Marcus, Section 7 of the Clayton Act and Mergers Involving Foreign Interests, 23 Stan.L.Rev. 205 (1971); Comment, Antitrust Considerations in International Corporate Activity: Technical Assistance Agreements and Foreign Acquisitions, 12 B.C.Ind. & Com.L.Rev. 453 (1971); Department of Justice, Memorandum Concerning Antitrust & Foreign Commerce, 5 Trade Reg.Rep. ¶ 50,129 (1972); Baker, Antitrust and the World Economy, 5 Trade Reg.Rep. ¶ 50,161 (1973).

16. Although Packer brought a separate action against Dictaphone US, it is not clear that Packer will be able to obtain full relief, if it prevails, unless Gutor is also a party.

17. Even had Gutor not waived arbitration, the antitrust counterclaim would not be arbitrable. See the excellent discussion in Cobb v. Lewis, 488 F.2d 41, 47-50 (5th Cir. 1974).