In the Matter of the Arbitration Between LAMINOIRS – TREFILERIES – CABLERIES de LENS, S. A., Petitioner,

v.

SOUTHWIRE COMPANY and Southwire International Corporation, Respondents.

SOUTHWIRE COMPANY and Southwire International Corp., Plaintiffs,

v.

LAMINOIRS–TREFILERIES–CABLERIES de LENS, S. A., Defendant.

Civ. A. Nos. C79–43N, C79–44N.

United States District Court,
N. D. Georgia,
Newnan Division.

Jan. 18, 1980.
Supplemental Opinion Feb. 18, 1980.

Gary W. Hatch, Hansell, Post, Brandon & Dorsey, Atlanta, Ga., Alexander & Green, New York City, for Laminoirs-Trefileries-Cableries de Lens, S. A.

Van C. Wilks, William V. Hearnburg, C. David Mecklin, Jr., Carrollton, Ga., Gambrell, Russell & Forbes, Atlanta, Ga., for Southwire Co. and Southwire Intern. Corp.

### ORDER

TIDWELL, District Judge.

The above-styled matter is before the Court pursuant to Laminoirs-Trefileries-Cableries de Lens' ("LTCL") motion for confirmation of arbitral awards, and Southwire Company's and Southwire International Corporation's ("Southwire") opposition thereto.

### Background

Southwire, a Georgia corporation which manufactures cable products, and LTCL, a French *société anonyme* which manufactures steel wire and rope, entered into a purchase agreement in 1974, whereby LTCL agreed to manufacture and sell, and Southwire agreed to buy, galvanized steel wire during the period from September 1, 1974, through December 31, 1980. The price to be paid by Southwire was to be determined and adjusted according to a formula based on the world market price of steel wire ("world market price adjustment clause"). Said purchase agreement contained an arbitration clause, and also contained a governing law clause, stating that the agreement would be governed by the laws of Georgia insofar as these laws are in accordance with French laws.

Disputes arose as to the interpretation of the world market price adjustment clause, alleged corrosion of the goods supplied by LTCL ("corrosion claim"), and alleged flaking of the zinc coating on the wire ("flaking claim").

Pursuant to the arbitration clause in the contract, LTCL demanded arbitration before an international tribunal in accordance with the rules of the International Chamber of Commerce ("ICC"). The Terms of Reference for such arbitration were signed by the parties and arbitrators on July 17, 1979.

On February 8, 1979, the arbitrators made a partial arbitral award, which accepted LTCL's interpretation of the world market price adjustment clause; ordered Southwire to pay LTCL the aggregate amount of underpayments caused by Southwire's interpretation of the clause (plus interest at the French legal rate); found in favor of Southwire on the corrosion claim (so that the amount of damage would be withheld from funds due LTCL); reserved judgment on the flaking claim and the costs of arbitration.

The parties thereafter settled the flaking claim, and on April 12, 1979, the tribunal entered a further arbitral award, confirming settlement of the flaking claim and allocating costs.

Southwire filed a state court action in Georgia, seeking vacation of the awards, which was removed to this court by LTCL. LTCL also filed a separate suit seeking confirmation of the awards. These actions have been consolidated.

Southwire has three basic objections to confirmation of the arbitral awards. These are:

(1) that the award was not made within six months from the date of the signing of the Terms of Reference for arbitration (as required by the rules of the ICC);

(2) that the arbitrators refused to entertain certain evidence deemed by Southwire to be material to its presentation of the case;

(3) that the arbitrators erroneously adopted the French legal rate of interest on the amounts due, without the introduction of any evidence on the French law or notice being given to Southwire that French law would be invoked; that the French rate applied violates the enforcing forum's public policy and is usurious; that the interest award is inconsistent with the Terms of Reference insofar as it awards post-award interest.

### Timeliness

With respect to the fact that the award was not made within six months after the Terms of Reference were signed, the Rules of the ICC Court of Arbitration provide that the court may, "if need be on its own initiative extend this time limit if it decides that it is necessary to do so." Art. 18, par. 2, ICC Rules. It appears from the record that when the date for the session of the court was moved from January 8, 1979 (before the six-month time period had elapsed) to January 19, 1979 (after the six-month limit), the court on its own motion extended the time in which a final award was to be rendered to April 30, 1979, and again on its own motion on April 11, 1979, further extended this date to July 21, 1979.

The above-cited rule for extension does not call for advance notice to the parties, should the court grant such an extension on its own motion. Further, there is nothing to indicate that Southwire lodged any protest once the initial six-month period had elapsed. In order to preserve one's rights, it is essential to protest against continuance of the arbitration proceedings after the stipulated time has elapsed. *Lodge No. 725, International Assoc. of Machinists v. Mooney Aircraft, Inc.,* 410 F.2d 681, 683 (5th Cir. 1969). A partial arbitral award, which dealt with the major substantive issues under submittal, was rendered three weeks after the initial six-month limit had elapsed. Southwire has not shown that any prejudice or actual harm was caused by the delay. *See Hotel, Motel, Restaurant and Hi-Rise Employees and Bartenders Union, Local 355 v. Fontainebleau Hotel Corp.,* 423 F.Supp. 83 (S.D.Fla.1976). For these reasons, the Court declines to vacate the awards on the ground of untimeliness.

### Exclusion of Evidence

Southwire contends that it was prevented from offering certain pertinent evidence at the arbitral hearing. In particular, it is argued that Southwire's attorney was prevented from fully cross-examining LTCL's international projects manager with regard to a renegotiation clause in the contract, and that allowance of such questioning would have been pertinent in showing an

intent on the part of LTCL to anticipatorily repudiate the contract.

The record reveals that the chairman of the arbitral tribunal expressed his willingness to allow Southwire to introduce facts relating to the renegotiation clause as having potential bearing on the intent of the parties at the time of the signing of the contract (T. 90). The arbitrators, however, were concerned that Southwire's questioning was aimed at eliciting admissions from the witness as to future course of conduct which would have no bearing on the matter before the tribunal (T. 85). Therefore, the chairman limited the questioning to "matters of fact albeit recent matters of fact which might conceivably have some bearing on what was the intent of the parties several years ago" (T. 85) (see also TT. 90, 99). Southwire was allowed to introduce documentary evidence on the parties' alleged intent as to future course of action, and allowed to make "argumentative interpretation" of such evidence in its summation to the tribunal (T. 104).

In its argument on improper exclusion of evidence, Southwire relies upon 9 U.S.C. § 10(c), which provides in pertinent part that a district court may vacate the award "where the arbitrators were guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy." It has been held, however, that arbitrators are charged with the duty of determining what evidence is relevant and what is irrelevant, and that barring a clear showing of abuse of discretion, the court will not vacate an award based on improper evidence or the lack of proper evidence. *Petroleum Transport Ltd. v. Yacimientos Petroliferos Fiscales*, 419 F.Supp. 1233, 1235 (S.D.N.Y.1976); *see also Orion Shipping & Trading Co. v. Eastern States Petroleum Corp. of Panama*, 312 F.2d 299, 300 (2d Cir. 1963), *cert. den.*, 373 U.S. 949, 83 S.Ct. 1679, 10 L.Ed.2d 705.

The Court concludes that the evidentiary decisions made by the tribunal were not clearly an abuse of discretion; nor did they deny Southwire a fair hearing. *Cf. Harvey Aluminum, Inc. v. United Steel-*

*workers of America*, 263 F.Supp. 488 (C.D. Cal.1967). Therefore, vacation of the awards on this ground is denied.

### Interest

The arbitral award of interest is attacked on several grounds. The arbitrators concluded, in response to LTCL's argument, that the French legal rate of interest (on judgments) should apply. The French statute relied upon by the tribunal was not specifically pleaded nor formally introduced into evidence, however. In their award, the tribunal merely states what the French law is and applies it. LTCL argues that the arbitrators took judicial notice of the French statute; Southwire argues that absent notice to it that French law would be relied upon, judicial notice was inappropriate.

The Court disagrees with Southwire's assertions. First of all, the contract's governing law clause contained a provision that the contract would be governed by Georgia law *to the extent that it was in accordance with French law*. The fact that this clause was cited by the Terms of Reference for arbitration should have, in and of itself, put Southwire on notice that French law had a potential bearing on the outcome of the case, thus precluding any issue of "unfair surprise". *See* Rule 44.1, Fed.R.Civ.P., Notes of Advisory Committee. While Southwire now contends that the tribunal misconstrued the governing law clause as applicable to interest rate determination, Southwire argued before the arbitrators that interest "should be assessed in accordance with Georgia law", and in support of such contention itself referred the arbitrators to its pleadings, "concerning the application of Georgia law to the *entire interpretation of the contract*" (T. 540) (emphasis supplied).

It was provided in the Terms of Reference for arbitration that the "arbitrators shall proceed and decide on the record." However, it has been held that arbitrators may draw on their own personal knowledge in making an award. *See Bernhardt v. Polygraphic Co.*, 350 U.S. 198, 203 n.4, 76

S.Ct. 273, 100 L.Ed. 199 (1955), *citing American Almond Products Co. v. Consolidated Pecan Sales*, 144 F.2d 448 (2d Cir. 1944). In *American Almond Products Co., supra*, Judge Learned Hand addressed the issue of whether it was "misbehavior" under 9 U.S.C. § 10(c) (grounds for vacating award) "to make an award in money without any evidence of market price." Judge Hand concluded that:

> [I]t was not 'misbehavior' to settle a controversy meant to be finally disposed of, by the only means open to the arbitrators, as the case stood. Arbitration may or may not be a desirable substitute for trials in courts; as to that the parties must decide in each instance. But when they have adopted it, they must be content with its informalities; they may not hedge it about with those procedural limitations which it is precisely its purpose to avoid.

*Id.* at 451.

■ Here, LTCL argued at the hearing that "the applicable legal interest rate is that in effect in France" (T. 538), and was quizzed by the tribunal as to the applicable French rate during the relevant period (T. 538), at which point the discussion continued off the record (T. 539). The arbitrators, in making the award, chose to rely on what they perceived to be, according to their own knowledge and investigation, the most appropriate French statute, rather than on the export discount rates introduced into evidence by LTCL (T. 534–5). As such, the arbitrators relied on the only means available to them—their own ascertainment of the appropriate French legal rate of interest for the period in question— in order to settle the controversy and finally dispose of it. *American Almond Products Co. v. Consolidated Pecan Sales, supra*, 144 F.2d at 451. The Court therefore concludes that the manner in which the amount of interest payable was determined by the arbitrators is not grounds for vacation under 9 U.S.C. §§ 10(c) or (d).

It is also contended that the award of interest should not be enforced as being usurious and against public policy. In making their award, the arbitrators determined that under the French law, the applicable annual rate for the time periods in question should be 10½% and 9½% (depending upon the date of maturity of the underpaid invoice), "increasing to fifteen and a half percent and fourteen and a half percent respectively after two months from the date of notification of the award

\* \* \* \* \* \* "

■ Article V, par. 2(b) of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C.A. § 201 *et seq.*, provides that enforcement of an award may be refused if such enforcement would be contrary to the public policy of the country where enforcement is sought. However, enforcement of foreign arbitral awards may be denied on this basis only where enforcement would violate the forum country's most basic notions of morality and justice. *Parsons & Whittemore Overseas Co. v. Societe Generale De L'Industrie Du Papier (RAKTA)*, 508 F.2d 969, 974 (2d Cir. 1974). *See also Gulf States Telephone Co. v. Local 1692, International Brotherhood of Electrical Workers*, 416 F.2d 198, 201 (5th Cir. 1969).

■ While the exaction of usury (". . . [taking] a greater sum for the use of money than the lawful interest." *Ga.Code Ann.* § 57–102) has been characterized by the Georgia Supreme Court as "odious, illegal, and immoral," *First Federal Savings & Loan Assoc. of Atlanta v. Norwood Realty Co.*, 212 Ga. 524, 527, 93 S.E.2d 763 (1956), the arbitrators concluded that the Georgia legal rate (7% per annum where the rate is not named in the contract, *see Ga.Code Ann.* § 57–101 (1979)) was not applicable under the governing law clause. In Georgia, rates of interest of 9½% and 10½% are not prohibited *per se*—the legal rate may be as high as 10½% per annum where the parties agree to such in writing, *Ga.Code Ann.* § 57–101 (1979); the rate of interest on a principal sum exceeding $3,000 loaned to a profit corporation may be set without limit by the parties in writing, *Ga. Code Ann.* § 57–118 (1979); interest rates on loans of $100,000 or more are limited

only by the agreement of the parties in writing, *Ga.Code Ann.* § 57–119. The existence of these statutes sufficiently convinces the Court that the exaction of interest rates of 9½% and 10½% per annum are not such as would violate this country's or this state's most basic notions of morality and justice. *See Parsons & Whittemore Overseas Co. v. (RAKTA), supra,* 508 F.2d at 974. We cannot have trade and commerce in world markets and international waters exclusively on our terms, governed by our laws, and resolved in our courts. *Scherk v. Alberto Culver Co.,* 417 U.S. 506, 519, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1973).

In applying the French law, however, the arbitrators held that the interest rates assessed should rise 5% per annum after two months from the date of the award, to rates of 14½% and 15½% per annum, respectively. (The French statute relied upon provides: "In the case of a judgment, the rate of legal interest shall be increased by 5 points upon the expiration of a period of two months from the day on which the court decision has become enforceable, even if only provisionally." French Law No. 75–619, July 11, 1975.)

◼ An award of interest is made so that a person wrongfully deprived of the use of his money should be made whole for his loss. *Miller v. Robertson,* 266 U.S. 243, 257–8, 45 S.Ct. 73, 69 L.Ed. 265 (1924); *Samincorp v. S. S. Rivadeluna,* 277 F.Supp. 943, 944 (D.Del.1967). A penalty, on the other hand, is a sum of money which the law exacts by way of punishment for doing something that is prohibited or omitting to do something that is required to be done. *In re Denver & R. G. W. R. Co.,* 27 F.Supp. 983 (D.Colo.1939). The law does not lightly impose penalties. *United States v. Murphy,* 326 F.2d 191 (2nd Cir. 1963). A foreign law will not be enforced if it is penal only and relates to the punishing of public wrongs as contradistinguished from the redressing of private injuries. *Southern Railway Co. v. Decker,* 5 Ga.App. 21, 25, 62 S.E. 678 (1908); *see also Sherman & Sons Co. v. Bitting,* 26 Ga.App. 299(2), 105 S.E. 848 (1921). Agreements to pay fixed sums as damages plainly

without reasonable relation to any probable damage which may follow will not be enforced. *Kothe v. R. C. Taylor Trust,* 280 U.S. 224, 226, 50 S.Ct. 142, 74 L.Ed. 382 (1930); *see also Jones v. Clark,* 147 Ga.App. 657, 659, 249 S.E.2d 619 (1978).

The Court concludes that the imposition of an additional 5% interest by the arbitrators in accordance with the French statute is penal rather than compensatory, and bears no reasonable relation to any damage resulting from delay in recovery of the sums awarded. Therefore, that portion of the award which purports to assess the rates of interest at 14½% and 15½% will not be enforced or recognized by this Court. 9 U.S.C.A. § 201, Art. V, par. 2(b), Convention on the Recognition and Enforcement of Foreign Arbitral Awards. The rates of 9½% and 10½%, as imposed by the arbitrators, will continue to accrue until the date of Judgment.

◼ Finally, Southwire has argued that the Terms of Reference for arbitration contemplated only imposition of pre-award interest, based on the following language contained therein:

Should such aggregate difference in the purchase price bear interest, and if so, from what date or dates should it be calculated, at what rate and *what is the aggregate amount of interest thus determined*? (emphasis supplied)

This language does not on its face limit the interest award to pre-award interest. Absent a more specifically expressed limitation on the award of post-award interest, the Court sees no error with the decision of the tribunal; the proceedings herein have caused LTCL the loss of use of its money award, for which post-award interest should compensate. *See generally Perkins v. Standard Oil Co. of California,* 487 F.2d 672, 676 (9th Cir. 1973); *Louisiana & Arkansas Railway Co. v. Export Drum Co.,* 359 F.2d 311, 315 (5th Cir. 1966) (post-judgment interest).

Inasmuch as the parties have expressed no objection to deferring certain unresolved questions with respect to the Court's entry of judgment (the actual amounts due, the exchange rates applicable, etc.), the Court

at this time makes only the following rulings with respect to the outstanding motions:

LTCL's motion for confirmation of the arbitral awards (Civil Action No. C79–43N) is hereby granted and sustained to the extent outlined above.

Southwire's counter-motion to vacate and set aside the arbitral awards (Civil Action No. C79–43N) and motion to vacate and set aside the arbitral awards (Civil Action No. C79–44N) are hereby overruled and denied.

The parties are ordered to submit to the Court a form of judgment agreed upon by them, or in the alternative, forms of judgment and supporting memoranda from each of them, within fifteen (15) days from the date of this order.

## SUPPLEMENTAL OPINION

By Order of January 18, 1980, the Court granted confirmation of certain arbitral awards in favor of Laminoirs-Trefileries-Cableries De Lens, S.A. ("LTCL") (Civil Action No. C79–43N) to the extent outlined in said Order, and overruled and denied the counter-motion of Southwire Company and Southwire International Corporation ("Southwire") to vacate and set aside the arbitral awards (Civil Action C79–43N) and their motion to vacate and set aside the arbitral awards (Civil Action No. C79–44N).

The parties have stipulated all amounts of French francs due under the Order, but the following issues remain in dispute:

(1) What rate of exchange should be applied to convert the French francs due into United States dollars?

(2) Whether there is due and owing by Southwire to LTCL any amount pursuant to a settlement agreement as to the "flaking claim," which agreement was adopted by the arbitration tribunal?

(3) What is the rate of post-judgment interest?

The Court will deal with each of the issues individually.

*Exchange Rate*

LTCL argues that the applicable exchange rate is that prevailing on the date of entry of this Court's judgment since payments by Southwire to LTCL were due and payable in France in French francs. *See Deutsche Bank Filiale Nurnberg v. Humphrey*, 272 U.S. 517, 47 S.Ct. 166, 71 L.Ed. 383 (1926). Southwire contends that the rate of exchange prevailing on the respective dates that Southwire's liability to LTCL matured would be the appropriate exchange rate. *See Hicks v. Guinness*, 269 U.S. 71, 46 S.Ct. 46, 70 L.Ed. 168 (1925).

■ When a debt is payable in foreign currency in a foreign country, the proper date of conversion is the judgment date, and not the date on which the obligation arose. *See Deutsche Bank Filiale Nurnberg v. Humphrey, supra; Gutor International AG v. Raymond Packer Co.*, 493 F.2d 938, 943 (1st Cir. 1974). In the present case, the LTCL invoices directed that payment was to be made by cable transfer to LTCL's bank in France; Southwire paid the invoices periodically by cabling French francs to the Royal Bank of Canada, Paris (a French bank where Southwire maintained an account) and tranferring French francs to LTCL's bank. It can therefore be said that Southwire's obligation to LTCL was performable in France, in French francs, and that the "judgment day" rule of exchange rate computation should apply. *See Paris v. Central Chiclera S. de R. L.*, 193 F.2d 960, 962 (5th Cir. 1952). "Judgment day" for purposes of the exchange rate computation would ordinarily be the date of this Court's judgment, *see Island Territory of Curacao v. Solitron Devices, Inc., 356* F.Supp. 1, 14 (S.D.N.Y.1973), aff'd 489 F.2d 1313 (2d Cir. 1973), cert. den. 416 U.S. 986, 94 S.Ct. 2389, 40 L.Ed.2d 763; counsel for LTCL, in deference to the Court, has stated that it will be "content to have the court use the foreign exchange rate for the preceding business day as published in the *Wall Street Journal* on the date of entry of judgment."

### Amount Due on Settled "Flaking Claim"

In their final award of April 25, 1979, the arbitrators ratified, confirmed, and adopted the settlement agreement between the parties dated February 16, 1979, in which it was specifically agreed that:

> . . . Southwire shall pay to LTCL Four Hundred Sixty-Two Thousand Six Hundred Thirty Seven French Francs (FF 462,637.00), that is the French francs equivalent, converted at the rate of 4.60 French francs per U.S. dollar, of One Hundred Thousand Five Hundred and Seventy Three U.S. Dollars and Twenty-Six Cents (U.S. Dollars 100,573.26).

■ It appears to the Court that the parties intended that payment pursuant to the settlement be made in *dollars*; unlike the payment of invoices by Southwire, which involved the transfer of French Francs in France, the settlement agreement was executed by Southwire's transfer of U.S. dollars. Southwire's obligations, in terms of dollars, have been fully satisfied. No further award on said claim is therefore justified.

### Post-Judgment Interest

■ Interest on a federal judgment is calculated from the date of entry at the rate allowed by state law. *See Gurley v. Lindsley*, 466 F.2d 498, 499 (5th Cir. 1972); 28 U.S.C. § 1961. Generally, interest on a Georgia judgment is to be calculated at 7% per annum, unless the contract or note upon which an action is based specifies a different rate. *See Chilivis v. Rogers Oil Co.*, 135 Ga.App. 176, 177, 217 S.E.2d 179(3) (1975); Ga.Code Ann. §§ 57–101, 57–108. Such different contract rate, however, must be within the Georgia legal limit. *See Daniel v. Gibson*, 72 Ga. 367, 369 (1884).

■ In its order partially confirming the arbitral award of interest, this Court noted that the application of the French legal rate of interest was not so offensive to Georgia's most basic notions of morality and justice as to warrant refusal of enforcement. In fixing post-judgment interest however, the Court must apply state law under 28 U.S.C. § 1961. *Gurley v. Lindsley,*

*supra.* At the time the contract in question was entered into, the highest lawful rate for which the parties could contract was 8%. *See Daniel v. Gibson, supra,* 72 Ga. at 368; Ga.Code Ann. § 57–101, ed. note. Accepting LTCL's argument that the "contract rate" should be applied to post-judgment interest, because the parties agreed to submit the determination of pre-judgment interest to the arbitrators, the laws of Georgia (as opposed to the public policy of the State) would allow a lawful rate of up to 8%, and this Court is bound by that figure. (LTCL is not claiming, and the Court does not award, post-judgment interest on that portion of the judgment amount which represents pre-judgment interest. *See Ga. Code Ann.* §§ 110–304.)

### Summary

In summary, the Court has made the following conclusions:

(1) The principal amounts due from Southwire to LTCL and interest, as per the Order of January 18, 1980, will be converted into dollars at the exchange rate existing on Tuesday, February 19, 1980, as published in the *Wall Street Journal* on February 20, 1980. (LTCL has agreed that the exchange rate on the business day preceding entry of judgment, as published in the *Wall Street Journal* may be employed by the Court in its calculations.)

(2) No further amount is owed by Southwire on the "flaking claim".

(3) Post-judgment interest will accrue at the rate of 8% per annum.

### Judgment

The Clerk is hereby directed to enter judgment on Wednesday, February 20, 1980, in favor of Laminoirs-Trefileries-Cableries De Lens, S.A. against Southwire Company and Southwire International Corporation, jointly and severally for the following sums:

| Computation of Principal and Interest (French Francs) | U.S. Dollars (conversion based on exchange rate of ——— French Francs to one U.S. Dollar, *Wall Street Journal,* February 20, 1980) |
| --- | --- |

*Item 1.* Principal amount Due on Invoices Maturing on or prior to March 11, 1977

French Francs 2,190,690.29    $ _____

*Item 2.* Interest on Item 1 Above From March 11, 1977 to December 31, 1977 at 10.5 Percent Per Annum

French Francs 188,490.63    $ _____

*Item 3.* Principal Amount Due on Invoices Maturing Between March 11, 1977 and December 31, 1977

French Francs 5,299,618.14    $ _____

*Item 4.* Interest on Item 3 Above (Invoices Maturing Between March 11, 1977 and December 31, 1977) From Their Respective Maturity Dates to December 31, 1977 at 10.5 Percent Per Annum

French Francs 214,260.39    $ _____

*Item 5.* Interest on Items 1 and 3 above For the Period January 1, 1978 to February 20, 1980 at 9.5 Percent Per Annum

French Francs 1,543,027.40    $ _____

*Item 6.* Principal Amount Due on Invoices Maturing Between January 1, 1978 and February 8, 1979

French Francs 6,358,050.26    $ _____

*Item 7.* Interest on Item 6 Above (Invoices Maturing Between January 1, 1978 and February 8, 1979) From Their Respective Maturity Dates to February 20, 1980 at 9.5 Percent Per Annum

French Francs 960,483.69    $ _____

*Item 8.* Principal Amount Due From Southwire on Amounts Withheld for Invoices Maturing Subsequent to February 8, 1979

French Francs 473,080.06    $ _____

Total
French Francs 17,227,700

Total
U. S. Dollars:
$ _____

Interest at the rate of 9.5% per annum on the principal amounts of Items 1, 3 and 6 above, _____ United States dollars (the equivalent of 13,848,358.69 French francs), continues to run in the amount of _____ United States dollars (the equivalent of 3,653.19 French francs) per day from January 25, 1980, until the date of entry of this Judgment. Interest after such date shall accrue at the rate of 8% per annum on _____ United States dollars (the equivalent of 14,321,438.75 French francs).

The arbitral awards direct that payment be made to LTCL in French francs; in converting French francs to U.S. dollars, the Court has utilized the exchange rate for converting French francs to U.S. dollars as of the business day preceding the entry of this judgment, the parties having agreed that the Court may obtain the applicable exchange rate from the *Wall Street Journal.*

Costs of Court are taxed against Southwire Company and Southwire International Corporation.