PLYMOUTH YONGLE TAPE
(SHANGHAI) CO., LTD.,
Plaintiff,

v.

PLYMOUTH RUBBER COMPANY,
LLC and Plymouth Rubber Co.,
Inc., Defendants,

Plymouth Rubber Co., LLC, Plaintiff–
in–Counterclaim,

v.

Delphi Automotive Systems, LLC,
Defendant–in–Counterclaim.

Civil Action No. 08–11599–JGD.

United States District Court,
D. Massachusetts.

Dec. 29, 2009.

Steven C. Bennet, Jennifer Y. Choy, Dana L. Salazar, Jones Day, New York, NY, Jennifer B. Furey, Cooley Manion Jones LLP, Boston, MA, Alan D. Rose, Jr., Meredith Ann Wilson, Rose, Chinitz & Rose, Boston, MA, for Plaintiff.

Michael R. Gottfried, Patricia R. Rich, Duane Morris LLP, Boston, MA, Matthew P. Horvitz, Cooley Manion Jones LLP, Boston, MA, Alan D. Rose, Jr., Rose, Chinitz & Rose, Boston, MA, for Plaintiff-in-Counterclaim.

Michael R. Gottfried, Duane Morris LLP, Boston, MA, Matthew P. Horvitz, Harry L. Manion, III, Cooley Manion Jones LLP, Boston, MA, for Defendant-in-Counterclaim.

## *MEMORANDUM OF DECISION AND ORDER ON MOTIONS OF PLYMOUTH RUBBER AND DELPHI AUTOMOTIVE SYSTEMS TO DISMISS*

DEIN, United States Magistrate Judge.

### I. *INTRODUCTION*

The plaintiff, Plymouth Yongle Tape (Shanghai) Co. Ltd. ("Yongle"), commenced this action against Plymouth Rubber Co., Inc. and its successor, Plymouth Rubber Co., LLC (collectively "Plymouth Rubber"), to recover amounts due for goods sold and delivered. Plymouth Rubber brought claims against Yongle and a third-party, Delphi Automotive Systems, Inc. ("Delphi"). Both Yongle and Delphi have moved to dismiss Plymouth Rubber's

claims against them. For the reasons detailed herein:

(1) Delphi's Motion to Dismiss (Docket No. 24) is ALLOWED;

(2) Yongle's Motion to Stay Litigation of Counterclaims Pending Arbitration, and to Compel Arbitration (Docket No. 17) is ALLOWED; and

(3) Yongle's Motion to Dismiss (Docket No. 17) is DENIED WITHOUT PREJUDICE. If Plymouth Rubber fails to amend its counterclaims in accordance with this decision within thirty (30) days from the date the stay referenced above is lifted, Yongle may renew its motion to dismiss for failure to join an indispensable party.

## II. *STATEMENT OF FACTS*

Plaintiff Yongle is a Chinese company. *Amended Complaint* (Docket No. 11) (*"Compl."*) ¶ 3. It is engaged in the business of manufacturing and exporting PVC tapes and related products from China to the United States and elsewhere. *Id.* ¶ 9. Defendant Plymouth Rubber LLC, the successor by conversion of defendant Plymouth Rubber Co., Inc., is a Delaware limited liability company with a principal place of business in Canton, Massachusetts. *Id.* ¶¶ 4–5. Plymouth Rubber "assisted in the organization of [Yongle], invested in [Yongle] and … from time to time, provided technical and marketing services." *Id.* ¶ 10. This court's jurisdiction over Yongle's complaint is based on diversity of citizenship, 28 U.S.C. § 1332. *Id.* ¶ 7.

Yongle and Plymouth Rubber are parties to a "Consignment Agreement" pursuant to which Plymouth Rubber was to order goods from Yongle. *Id.* ¶¶ 11–12. Specifically, but without limitation, pursuant to the Consignment Agreement Yongle, in response to Plymouth Rubber's orders, would "ship the goods to [Plymouth Rubber] on a consignment basis, so that [Yongle] will retain full title and ownership in the shipped goods until such time as [Yongle] has been paid in full for the shipped goods, or until they are sold by [Plymouth Rubber]." *Id.* ¶ 13. According to the complaint, Plymouth Rubber was repeatedly delinquent in its payments, and negotiations with the company to obtain payment proved futile. *Id.* ¶¶ 19–21. On August 14, 2009, Plymouth Rubber advised Yongle that its largest customer in the United States (who was subsequently identified as Delphi) intended to terminate its relationship with Plymouth Rubber. *Id.* ¶ 22. As of that date, Plymouth Rubber allegedly owed Yongle more than $5 million for goods delivered to Plymouth Rubber. *Id.* ¶ 23. Plymouth Rubber has allegedly failed to account for the goods, provide an inventory, return the goods, allow for an inspection, or make payments. *Id.* ¶¶ 25–26.

Yongle has brought suit against Plymouth Rubber, raising the following claims:

Count I: Declaratory Judgment that the Consignment Agreement has been terminated due to Plymouth Rubber's breach and is no longer in effect. (*Id.* ¶¶ 27–28).

Count II: Conversion due to Plymouth Rubber's refusal to return the goods. (*Id.* ¶¶ 29–31).

Count III: Breach of the Consignment Agreement due to Plymouth Rubber's failure to pay for the goods shipped by Yongle. (*Id.* ¶¶ 32–34).

Count IV: Breach of Fiduciary Duty based on Plymouth Rubber's status as "an advisor and insider of [Yongle]." (*Id.* ¶ 36). This claim is based on the defendants' alleged "persistent refusal to cooperate with [Yongle] in managing the export business, their refusal to pay for goods, their refusal to account and permit inspection and their refusal to return goods[.]" (*Id.* ¶ 37).

Count V: Accounting, Inspection and Return of Goods. (*Id.* ¶¶ 39–42).

Count VI: Violation of Massachusetts Gen. Laws ch. 93A. (*Id.* ¶¶ 43–45).

Plymouth Rubber filed an answer denying liability, and asserted counterclaims against Yongle and Delphi. *Amended Answer and Counterclaim to Amended Complaint* (Docket No. 15) (*"PR Answer"* and *"PR Claim"*). Delphi is described as a limited liability corporation organized under the laws of the state of Delaware with a principal place of business in Troy, Michigan. *PR Claim* ¶ 3. This court's jurisdiction over Plymouth Rubber's claims is based on diversity pursuant to 28 U.S.C. § 1332. *Id.* ¶ 4.

According to the Counterclaim, "Plymouth and Yongle entered into a comprehensive business deal whereby Plymouth ultimately closed its United States manufacturing facility and contributed certain of its intellectual property for, among other things, rubber-based adhesives, primers, PVC films, formulations, vendors, technical standards, and inspection methods to Yongle in exchange for the exclusive right in the Western Hemisphere to purchase and sell proprietary products, which were made with and incorporated the intellectual property and were manufactured by Yongle in China ("Proprietary Product Line")." *Id.* ¶ 8. This "comprehensive business deal" was reflected in several agreements executed on December 22, 2004.

The principal agreement was an Equity Investment and Transfer Agreement ("Equity Agreement") between Awesome Profits Limited ("Awesome") and Plymouth Rubber, pursuant to which Awesome and Plymouth Rubber increased their investment in Yongle. *Id.* ¶ 9. As a general statement, Awesome was to contribute the plant and equipment to manufacture the PVC tapes, and Plymouth Rubber was to invest its "proprietary" technical informa-

tion. *Id.* ¶¶ 10–14. In addition to, and as "an integral part of the Equity Agreement," Awesome, Plymouth Rubber and Yongle executed a Technology Transfer Agreement pursuant to which Plymouth Rubber contributed its proprietary information in exchange for the exclusive right in the Western Hemisphere to purchase and sell the Proprietary Product Line manufactured by Yongle. *Id.* ¶¶ 15–16. The final agreement, which is also characterized as "an integral part of the Equity Agreement," was a Sales and Distribution Agreement between Awesome, Hebei Huaxia Enterprise Co., Ltd. ("Huaxia"), Plymouth Rubber and Yongle. *Id.* ¶ 17. Pursuant to that agreement, Plymouth Rubber had the exclusive right to sell the Proprietary Product Line in North America, Central America and South America, and neither Awesome, Huaxia nor Yongle could sell the Proprietary Product Line directly or indirectly in these regions. *Id.* ¶¶ 18–19.

Plymouth Rubber sold the Proprietary Product Line in the Western Hemisphere through its sales representative, Staffco. *Id.* ¶ 20. Its customers included Delphi, Lear Corp. ("Lear"), Condumex, and others. *Id.* Plymouth Rubber claims that disputes arose between Yongle and Plymouth Rubber regarding Yongle's business and financial operations, as well as the quality and pricing of the product being manufactured by Yongle. *Id.* ¶ 21. It further alleges that in or about May 2008, Yongle informed Plymouth Rubber that Yongle had been in direct contact with Delphi, which contact eventually resulted in Yongle (and/or Staffco) selling directly to Delphi and other Plymouth Rubber customers, allegedly in violation of the Equity Agreement, Technology Transfer Agreement and the Sales and Distribution Agreement. *Id.* ¶¶ 22–35. While Plymouth Rubber acknowledges that during the summer of 2008 it was addressing pricing concerns raised by Delphi, Plymouth Rub-

ber alleges that during the same time Yongle and Staffco were in direct communication with Delphi, in violation of the Sales and Distribution Agreement. *Id.* ¶¶ 25, 26. In addition, Plymouth Rubber contends that by working directly with Yongle and each other, Delphi and Staffco also breached their respective agreements with Plymouth Rubber. *Id.* ¶¶ 22, 30.

On August 24, 2008, Yongle sent Plymouth Rubber and Huaxia a letter purporting to terminate the Sales and Distribution Agreement due to an alleged failure to pay by Plymouth Rubber. *Id.* ¶ 27. Plymouth Rubber contends that this termination was improper, and in violation of the Sales and Distribution Agreement. *Id.*

Plymouth Rubber has brought the following claims, all of which Yongle and Delphi contend should be dismissed:

Counts I & II (vs. Yongle) Breach of the Equity, Technology Transfer and Sales and Distribution Agreements by selling the Proprietary Product Line directly to Delphi and Lear Corp.; improperly pledging assets of Yongle for loans and improperly accounting for funds from Awesome; manufacturing and shipping defective products to Plymouth Rubber and failing to properly price the goods; selling product to Huaxia at cost, and improperly purporting to terminate the Sales and Distribution Agreement without board approval. Plymouth Rubber is seeking damages (Count I) and specific performance of the Agreements. (Count II).

Count III (vs. Yongle) Breach of the implied covenant of good faith and fair dealing found in the Equity, Technology Transfer and Sales and Distribution Agreements.

Count IV (vs. Yongle) Tortious interference with advantageous and contractual relations that Plymouth Rubber had with Staffco and its customers, including Delphi and Lear, as well as its supplier and prospects.

Count V (vs. Delphi) Tortious interference with advantageous and contractual relations that Plymouth Rubber had with Staffco and Yongle.

Count VI–VIII (vs. Yongle) Misappropriation of proprietary information and Proprietary Product Line by entering into arrangements with Delphi, Staffco, Lear and other customers, and not limiting the use of such information to "proper business dealings by Yongle" in accordance with the Equity, Technology Transfer and Sales and Distribution Agreements. (Count VI). Such conduct also allegedly violated Massachusetts Gen. Laws ch. 93, § 42 (Count VII) and induced Staffco, Delphi, Lear and others to misappropriate Plymouth Rubber's confidential information. (Count VIII).

Count IX (vs. Delphi) Inducing Yongle and Staffco to misappropriate Plymouth Rubber's proprietary information and Proprietary Product Line.

Counts X & XI (vs. both) Civil conspiracy between Delphi (Count X) and Yongle (Count XI) to misappropriate Plymouth Rubber's confidential and proprietary information and to violate their agreements with Plymouth Rubber.

Counts XII & XIII (vs. both) Injunctive relief against Yongle (Count XII) and Delphi (Count XIII) to preclude them from using the proprietary information to manufacture product and to sell to anyone, including Plymouth's customers.

### *Other Litigation*

On September 15, 2008, Delphi filed suit in a Michigan State Court against Plymouth Rubber seeking to recover amounts Delphi contends were due it from Plym-

outh Rubber for overcharges. *Furey Decl.* (Docket No. 27) Ex. 1.[1] Plymouth Rubber, in turn, asserted counterclaims against Delphi for breach of contract based on Delphi's alleged bad faith termination of its contract with Plymouth Rubber, and its decision to buy product directly from Yongle. *Id.* Ex. 2. That case is still pending.

On September 15, 2008, Plymouth Rubber brought suit against Staffco in Suffolk Superior Court alleging that it had entered into an Exclusive Sales Agreement with Staffco, in connection with which Plymouth Rubber provided Staffco with Proprietary Information. *Bennett Decl.* (Docket No. 18) ¶¶ 6–7. In addition, Plymouth Rubber alleged, Staffco knew that Plymouth Rubber had the exclusive right to import Yongle's Proprietary Products into the United States, and knew that Delphi was a key customer of Plymouth Rubber. Plymouth Rubber alleged that Staffco breached its Agreement by attempting to terminate the Agreement, and by buying product directly from Yongle and selling it directly to Delphi. *Id. See Bennett Decl.* Ex. 3. In response to Staffco's motion, the matter has been stayed. Staffco has initiated an arbitration proceeding before the International Chamber of Commerce which is proceeding. *Bennett Decl.* ¶ 10.

Additional facts will be provided below where appropriate.

## III. *ANALYSIS*

### A. *Delphi's Motion to Dismiss*

Delphi has moved to dismiss the claims against it on the grounds of lack of diversi-

ty. Specifically, Delphi contends that the claims brought against Yongle which involve Delphi are permissive, not compulsory counterclaims, and that, therefore, there must be an independent basis for jurisdiction over those claims. Since both Plymouth Rubber and Delphi are Delaware entities, there is no diversity between them. This court agrees with Delphi and Delphi's motion to dismiss is allowed.

### 1. *The Diversity Analysis*

"The statutory grant of federal jurisdiction in diversity cases gives district courts 'original jurisdiction of all civil actions where the matter in controversy ... is between ... citizens of different States.' 28 U.S.C. § 1332(a). This statutory grant requires *complete* diversity between the plaintiffs and defendants in an action." *Picciotto v. Cont'l Cas. Co.,* 512 F.3d 9, 17 (1st Cir.2008) (punctuation in original). "Limited liability companies are unincorporated entities. The citizenship of an unincorporated entity, such as a partnership, is determined by the citizenship of all of its members." *Pramco, LLC ex rel. CFSC Consortium, LLC v. San Juan Bay Marina, Inc.,* 435 F.3d 51, 54 (1st Cir. 2006). In the instant case, Delphi is a limited liability company organized under the laws of Delaware and its sole member is a corporation organized under Delaware law. *See PR Claim* ¶ 3. Plymouth Rubber is also a limited liability company organized under the laws of Delaware. *Id.* ¶ 1. While Plymouth Rubber has not identified the citizenship of its members, it does not dispute Delphi's contention that for juris-

---

1. Delphi has filed exhibits attached to the declaration of its counsel, Jennifer B. Furey (Docket No. 27). The parties have no objection to this court considering the pleadings from other actions, and the documents are not in dispute. *See Boateng v. InterAmerican Univ., Inc.,* 210 F.3d 56, 60 (1st Cir.2000) (a court may look to matters of public record, including documents from prior state court adjudications, in deciding a Rule 12(b)(6) motion). Yongle has submitted its exhibits attached to the declaration (Docket No. 18) and reply declaration (Docket No. 34) of its counsel, Steven C. Bennett. Plymouth Rubber has submitted its documents attached to the affidavit of its counsel, Ben N. Kuruvilla (Docket No. 30).

dictional purposes, Plymouth Rubber should be considered a citizen of Delaware.[2] Unless the claims involving Delphi are compulsory counterclaims so that Plymouth Rubber can rely on this court's supplemental jurisdiction,[3] the claims against Delphi must be dismissed. "Only compulsory counterclaims can rely upon supplemental jurisdiction; permissive counterclaims require their own jurisdictional basis." *Iglesias v. Mut. Life Ins. Co. of N.Y.*, 156 F.3d 237, 241 (1st Cir. 1998). For the reasons detailed below, this court finds that the counterclaims are not compulsory.

### 2. Compulsory vs. Permissive Counterclaims

A compulsory counterclaim is one that "(A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and (B) does not require adding another party over whom the court cannot acquire jurisdiction." Fed.R.Civ.P. 13(a)(1). Claims that are not compulsory must be treated as permissive. *See* Fed.R.Civ.P. 13(b).

■ "There are at least four tests to determine whether a counterclaim is compulsory or permissive: 1) Are the issues of fact and law raised by the claim and counterclaim largely the same? 2) Would res judicata bar a subsequent suit on defendant's claim absent the compulsory counterclaim rule? 3) Will substantially the same evidence support or refute plaintiff's claim as well as defendant's counterclaim? 4) Is there any logical relation between the claim and counterclaim." *Iglesias,* 156 F.3d at 241. "[A] logical relationship exists between two claims when 'the same operative facts serve as the basis of both claims ... or the aggregate core of facts upon which the claim rests activates additional legal rights, otherwise dormant, in the defendant.' " *Fadum Enters., Inc. v. Liakos,* 694 F.Supp. 973, 975 (D.Mass. 1988) (quoting *Montgomery Elevator Co. v. Bldg. Eng'g Servs. Co., Inc.,* 730 F.2d 377, 380 (5th Cir.1984)). In the instant case, the application of these factors establishes that Plymouth Rubber's claims against Delphi do not constitute compulsory counterclaims.[4]

Yongle's claims against Plymouth Rubber arise out of Yongle's delivery of product to Plymouth Rubber and Plymouth Rubber's alleged refusal to pay for, return, or allow the inspection of, such goods. The claims are based on the rights and obligations of Yongle and Plymouth Rubber under the Consignment Agreement, and relate to transactions which were in conformity with the parties' con-

---

**2.** In its opposition to Yongle's motion to dismiss, Plymouth Rubber represents that it is wholly owned by Long Dash PRC, LLC, which is another Delaware limited liability company. *See PR Opp.* (Docket No. 28) at 16.

**3.** The supplemental jurisdiction of a federal court is defined by 28 U.S.C. § 1367(a), which provides that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." Pursuant to this statute, federal courts have supple-

mental jurisdiction over compulsory counterclaims, but permissive counterclaims must be "supported by an independent basis of jurisdiction." *Iglesias v. Mut. Life Ins. Co. of N.Y.,* 156 F.3d 237, 241 (1st Cir.1998) (citing *McCaffrey v. Rex Motor Transp., Inc.,* 672 F.2d 246, 248 (1st Cir.1982)).

**4.** It is undisputed that only Plymouth Rubber's claims against Delphi are relevant to determining whether diversity jurisdiction exists, and that "[i]t is wholly irrelevant whether the counterclaims against Yongle are compulsory because those counterclaims have no impact on the subject matter jurisdiction of this Court." *PR Opp. to Delphi* (Docket No. 31) at 5 n. 2.

tractual relations, *i.e.,* Yongle selling product exclusively to Plymouth Rubber for resale in the Western Hemisphere. In contrast, Plymouth Rubber's claims against Delphi do not have anything to do with the goods Yongle delivered to Plymouth Rubber. In fact, Plymouth Rubber's claims against Delphi are based on Plymouth Rubber's contention that Delphi wrongfully arranged for the purchase of other product directly from Yongle, bypassing Plymouth Rubber. By buying product directly from Yongle, Delphi allegedly interfered with Plymouth Rubber's rights to be the exclusive seller (*PR Claim* Count V), and allegedly induced Yongle and Staffco to misappropriate proprietary information belonging to Plymouth Rubber. (*PR Claim* Counts IX–X). The claims do not involve the same contracts, or the same allegedly wrongful conduct as Yongle's claims and, therefore, are permissive. *See Cont'l Fed. Sav. & Loan Ass'n v. Delta Corp. of Am.,* 71 F.R.D. 697, 701 (W.D.Okla.1976) (counterclaim is permissive where "alleged breaches involve different contract provisions and [relate] to acts of different parties during entirely different time frames"); *McCaffrey v. Rex Motor Transp., Inc.,* 672 F.2d 246, 249 (1st Cir.1982) (where in direct suit Pension Fund sued employer for failing to make contributions in given years, employer's counterclaims for overpayment were permissive where different years were involved, the Fund's right to recover was not dependent on the outcome of employer's counterclaims and the original claim did not activate otherwise dormant claims of the employer). The mere fact that Yongle's claims and Plymouth Rubber's counterclaims all arose out of a business relationship between the same parties is insufficient to make the counterclaims compulsory even if there is "some factual overlap" between them. *Fadum Enters., Inc.,* 694 F.Supp. at 975–76 (where plaintiff's claims were based on its business relationship with the defendant, claims of taking of trade secrets after the relationship ended and a related claim of violation of Mass. Gen. Laws ch. 93A were not compulsory counterclaims "since they rest on events that occurred after the relationship had ended. Although these claims have some factual overlap" with the plaintiff's claims, "they are not 'logically related[.']'").

Plymouth Rubber contends that the counterclaims are compulsory because Yongle alleged that Plymouth Rubber breached fiduciary duties and, therefore, somehow called into question all of the parties' business transactions. This argument overstates Yongle's claims. Yongle contends that Plymouth Rubber owed Yongle a fiduciary duty arising out of its status as "an advisor to and insider of" Yongle, and breached its fiduciary duty by failing to "to cooperate with [Yongle] in managing its export business," and refusing to pay for, account for, allow the inspection of, or return the goods which had been delivered, which actions "all individually, and collectively constitute a violation of [Plymouth Rubber's] fiduciary duty to [Yongle]." *Compl.* ¶¶ 36–37. No further definition of Plymouth Rubber's obligations vis-à-vis "managing" Yongle's export business is provided. Since the only wrongful conduct which is alleged in the complaint relates to the lack of accounting for the delivered goods, a fair reading of the complaint is that the alleged "failure to cooperate in management of the business" must have to do with Plymouth Rubber's obligations in connection with the goods which were delivered by Yongle but were not paid for. There are no factual allegations which would support a broader reading.

In any event, Plymouth Rubber's counterclaims against Delphi do not relate to any generalized "management" activities. Rather, Plymouth Rubber challenges the

fact that product was sold directly to Delphi by Yongle, thereby allegedly violating Yongle's obligations to sell exclusively to Plymouth Rubber and its obligations to maintain the confidentiality of Plymouth Rubber's proprietary information. The counterclaims raised against Delphi do not implicate any fiduciary duties which may, or may not, exist as a result of Plymouth Rubber's status as an advisor or insider of Yongle.

Finally, to the extent that Yongle will have to prove that Plymouth Rubber owed it a fiduciary duty, proof of that fact does not involve Delphi or any of the actions which Plymouth Rubber challenges in its counterclaims. Plymouth Rubber's role as "an advisor to and insider of" Yongle is dependent on agreements and facts which do not implicate Delphi. Thus, the addition of the claim of breach of fiduciary duty does not alter the conclusion that the counterclaims against Delphi are permissive.[5]

In sum, the counterclaims asserted by Plymouth Rubber against Delphi do not involve the same issues of fact or law as Yongle's claims, do not involve the same evidence and are not "logically related" in that the same operative facts do not serve as the basis of both claims. Since the claims and counterclaims are distinct, and the same issues will not be tried, the doctrine of *res judicata* has no application. *See Jarosz v. Palmer*, 436 Mass. 526, 530–31, 766 N.E.2d 482, 487–88 (2002) ("The doctrine of issue preclusion provides that when an issue has been actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclu-sive in a subsequent action between the parties whether on the same or different claim." (internal quotation omitted)). Therefore, Delphi's motion to dismiss is ALLOWED.[6]

### B. *Yongle's Motion to Dismiss*

Yongle has moved to dismiss the counterclaims asserted by Plymouth Rubber, or, in the alternative, for an order compelling arbitration and a stay of the litigation of the counterclaims pending arbitration. For the reasons detailed herein, the motion to dismiss is denied without prejudice, but the motion to compel arbitration, and stay litigation of the counterclaims pending arbitration, is allowed.

Yongle has moved to dismiss the counterclaims on the grounds that (1) this court lacks jurisdiction; (2) there is a failure to join indispensable parties, and (3) the claims are "legally inadequate." (Docket No. 17). Each of these arguments will be addressed in turn.

### 1. *Lack of Subject Matter Jurisdiction*

Yongle argues that this court lacks diversity jurisdiction over the counterclaims because both Delphi and Plymouth Rubber are Delaware citizens. However, as detailed above, Delphi is being dismissed from this case. Since it is undisputed that there is complete diversity between Yongle and Plymouth Rubber, no further discussion of this argument is warranted.

### 2. *Failure to Join Indispensable Parties*

Yongle contends that Plymouth Rubber's counterclaims must be dismissed for failure to join indispensable parties.

---

5. Delphi argues, and this court agrees, that it is difficult to understand how Plymouth Rubber can contend that its claims against Staffco are not compulsory counterclaims while its claims against Delphi are compulsory. The claims against Staffco and Delphi are virtually identical.

6. The court will not address the other arguments raised by Delphi in support of its motion to dismiss, and expresses no opinion as to the merits of those arguments.

Those parties, according to Yongle, are Awesome—a party to the Equity, Technology Transfer and Sales and Distribution Agreements; CHT Holdings Inc. ("CHT")—the parent company of Awesome; Huaxia—a party to the Sales and Distribution Agreement; Mr. Wong Fung—the Chairman of CHT, Huaxia and Yongle and President of Awesome; and the customers who allegedly improperly bought directly from Yongle, *i.e.* Delphi, Staffco, Lear and Condumex. As detailed below, Plymouth Rubber may either drop certain of its counterclaims and/or seek to add Awesome and Huaxia. Under either scenario, the suit will not be dismissed at this time. With respect to Delphi, however, Plymouth Rubber must either drop its conspiracy claim against Yongle or the action will be dismissed for failure to join an indispensable party.

Fed.R.Civ.P. 19(a) provides as follows:

(1) *Required Party.* A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:

(A) in that person's absence, the court cannot accord complete relief among existing parties; or

(B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

(i) as a practical matter impair or impede the person's ability to protect the interest; or

(ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

If a person who is required to be joined cannot be joined, "the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dis-

missed" after considering certain factors. Fed.R.Civ.P. 19(b). Thus, the question whether these omitted parties are indispensable "is a two part inquiry. First, the party must be a necessary party under Rule 19(a), and then it must be an indispensable party under Rule 19(b)." *United States v. San Juan Bay Marina,* 239 F.3d 400, 405 (1st Cir.2001) (internal citations omitted).

■ Yongle, as the party seeking to dismiss the counterclaims, "carries the burden of showing why an absent party should be joined." *Raytheon Co. v. Cont'l Cas. Co.,* 123 F.Supp.2d 22, 32 (D.Mass. 2000). It is a fact-specific analysis and, as the parties agree, the court may consider evidence outside the pleadings in making its assessment. *Id.* Fundamentally, the "Rule aims to achieve a practical objective[,]" specifically " 'to achieve judicial economies of scale by resolving related issues in a single lawsuit,' while at the same time preventing 'the single lawsuit from becoming fruitlessly complex or unending.' " *Pujol v. Shearson/Am. Express, Inc.,* 877 F.2d 132, 134 (1st Cir.1989) (quoting *Smuck v. Hobson,* 408 F.2d 175, 179 (D.C.Cir.1969)). In addition, the court must consider " 'the interest of absentees in avoiding the possible prejudice effect of deciding the case without them.' " *Picciotto,* 512 F.3d at 15–16 (quoting *Acton Co., Inc. of Mass. v. Bachman Foods, Inc.,* 668 F.2d 76, 78 (1st Cir.1982)).

### Signatories to the Contracts

The first group of parties Yongle contends are indispensable are Awesome, CHT, Huaxia and Mr. Fung. As an initial matter, there is no wrongdoing alleged on the part of Mr. Fung in his individual capacity. He is not necessary for any requested relief, and is not claiming an interest relating to the subject of the action in his individual capacity. Therefore,

he is not a necessary party. Similarly, CHT is not a party to any of the Agreements at issue, and does not seem to have any distinct role or interest in the issues in dispute.[7] Thus, CHT is not a necessary party either.

The others, Awesome and Huaxia, are both signatories to the contracts with Plymouth Rubber. "As a general statement, it is well established that a party to a contract which is the subject of the litigation is considered a 'necessary' party." *Blacksmith Invs., LLC v. Cives Steel Co., Inc.,* 228 F.R.D. 66, 74 (D.Mass.2005) (internal quotations omitted). The rule, however, is not absolute. *See In re Olympic Mills Corp.,* 333 B.R. 540, 552 (1st Cir. BAP 2005) ("there is no hard and fast rule that requires all parties to a contract to be joined as parties in a breach of contract suit that is before a federal court sitting in diversity"), *aff'd,* 477 F.3d 1 (1st Cir.2007). *See also Hutchins v. Cardiac Sci., Inc.,* 456 F.Supp.2d 173, 193 (D.Mass.2006) (when plaintiff unaccountably failed to seek to add party to contract in a timely manner, motion to add signatory to contract denied). Here, an analysis of the claims at issue establishes that these entities are necessary parties for only limited claims.

First of all, Plymouth Rubber is not challenging the validity of the Agreements. None of the relief Plymouth Rubber is seeking would invalidate the rights of Awesome or Huaxia under the Agreements. To the extent that Plymouth Rubber is seeking specific performance of the Agreements, its claims are directed at Yongle and will not affect Awesome or Huaxia. Consequently, they are not *per se* indispensable parties. *See Acton Co., Inc.*

*of Mass.,* 668 F.2d at 81–82 (all parties to a contract are indispensable in an action seeking recision of the contract), and cases cited.

■ Plymouth Rubber's principal claims relate to Yongle's decision to terminate the Sales and Distribution Agreement and to sell product directly to Plymouth Rubber's customers. Plymouth Rubbers claims that this conduct breached that Agreement, as well as the Equity and Technology Transfer Agreements, and resulted in the misappropriation of Plymouth Rubber's confidential information. With respect to those claims, Awesome and Huaxia are not necessary parties. Despite Yongle's conclusory argument that these parties are necessary to resolve the dispute, a review of the Agreements indicates that Yongle's obligations under the Agreements are distinct and Yongle was the primary entity responsible for selling product to Plymouth Rubber. *See, e.g., Sales and Distribution Agreement* (Bennett Decl. Ex. 15) at § 3.1(v) (Yongle must sell product through Plymouth Rubber); § 4.2 (Plymouth Rubber to purchase product from Yongle). Yongle apparently acted on its own in seeking to terminate the Sales and Distribution Agreement.[8] Therefore, Yongle would be the only entity responsible for damages if Plymouth Rubber prevails. Complete relief can be afforded in the action with only Yongle as a party, and this suit against Yongle does not expose Yongle to inconsistent obligations. Moreover, the rights of Awesome or Huaxia are not impaired by allowing the counterclaims to go forward in their absence. Yongle either breached the Agreements by bypassing Plymouth Rubber and selling di-

---

**7.** Plymouth Rubber does allege that Yongle improperly "made a negative pledge of its assets to secure financing for CHT" but that allegation challenges Yongle's conduct, not CHT's. *See PR Claim* ¶ 21 C.

**8.** For example, it is alleged that Yongle sent its termination notice to both Plymouth Rubber and Huaxia under the Sales and Distribution Agreement. *PR Claim* ¶ 27. Huaxia did not join Yongle in sending the letter.

rectly to Delphi or it did not. Thus, if the only counterclaims related to direct sales to customers, Awesome and Huaxia would not be necessary parties.

The more difficult issue is caused by Plymouth Rubber's contention that Yongle breached its Equity, Technology Transfer and Sales Distribution Agreements by, *inter alia,* "pledging assets of Yongle on loans without unanimous board approval;" improperly listing Awesome's investment under the Equity Agreement as a debt on Yongle's books, thereby mandating that Awesome's investment would be recouped before Plymouth Rubber would get any profits; "selling the Proprietary Product Line to Huaxia at cost" and "purporting to terminate the Sales and Distribution Agreement without approval of the board of directors." *See PR Claim* ¶¶ 11, 21A, B & D, 38. These alleged breaches of the parties' Agreements, on their face, appear to implicate the interests of Awesome and Huaxia.

Plymouth Rubber is correct that complete relief can be accorded for these claims with just Yongle as the defendant-in-counterclaim. The Agreements make it clear that Yongle is a separate company. It has a Board of Directors as its "highest authority" and "Management Personnel who are responsible for the day-to-day operations of the company." *See, e.g.,* Equity Agreement at Chapters 10 & 11. Yongle is responsible for its own accounting. *See Id.* at Article 55. Thus, to the extent that Yongle breached the Agreements by acting without appropriate authority or by mischaracterizing Awesome's investment or by improperly pricing goods, Yongle would be in a position to rectify the situation. Consequently, Awesome and Huaxia are not necessary parties under Fed. R.Civ.P. 19(a)(1)(A).

■ However, Awesome has an interest in how its investment is treated under the Equity Agreement. According to Plymouth Rubber, the recording of Awesome's investment as a debt was to Awesome's considerable advantage. If Awesome is not a party to the action, and Plymouth Rubber prevails, Awesome's interests could be impaired without Awesome being able to protect its interest. Its remedy would be to then sue Yongle but, if Awesome prevailed, Yongle would face a substantial risk of incurring inconsistent obligations: in Plymouth Rubber's suit, Yongle would have to recharacterize Awesome's investment other than as a debt, while in Awesome's lawsuit Yongle would have to recharacterize Awesome's investment as a debt again. Both suits would be based on the same Agreements although the suits themselves would have different parties. Under such circumstances, Awesome is a necessary party under Rule 19(a)(1)(B). *See Delgado v. Plaza Las Americas, Inc.,* 139 F.3d 1, 3 (1st Cir.1998) ("Inconsistent obligations occur when a party is unable to comply with one court's order without breaching another court's order concerning the same incident.").

The next inquiry is whether this action should be dismissed or proceed among the existing parties. Plymouth Rubber has submitted evidence indicating that this court would have jurisdiction over Awesome, and that the addition of Awesome would not destroy this court's diversity jurisdiction. On the other hand, it seems that the addition of Awesome would not be without complications. Yongle has submitted evidence which indicates that this court may not have jurisdiction over Awesome. The resolution of this issue may be time consuming and expensive.

In "equity and good conscience," this court concludes that the issue whether Yongle breached the Agreements by characterizing Awesome's investment under the Equity Agreement as a debt should

not proceed in Awesome's absence. Given that this is only a small part of the counterclaims, however, Plymouth Rubber will be given the option of either dropping that claim in this litigation, or adding Awesome. The issue whether this court has jurisdiction over Awesome is best resolved when and if Awesome challenges Plymouth Rubber's contention that this court has jurisdiction.

■ With respect to Huaxia, there is a claim that Yongle breached its Agreements by selling product to Huaxia at cost. Huaxia clearly has an interest in what it is charged. It will not be in a position to protect its interest if it is not a party. Moreover, failure to join Huaxia on this issue would leave Yongle subject to a substantial risk of incurring inconsistent obligations. If Yongle loses against Plymouth Rubber, Yongle may be prohibited from charging Huaxia an agreed upon amount. If Huaxia then sues Yongle and wins, Yongle may be obligated to charge Huaxia an amount which it is prohibited from charging under Plymouth Rubber's suit. Under these circumstances, Huaxia is a necessary party to the instant litigation under Rule 19(a)(1)(B).

The analysis whether Huaxia is indispensable is the same as with Awesome. Whether this court can exert personal jurisdiction over Huaxia is subject to dispute, with Plymouth Rubber and Yongle having submitted conflicting evidence. Again, however, this claim against Huaxia is a small part of Plymouth Rubber's counterclaims. Therefore, Plymouth Rubber will be given the same option as with Awesome: it may drop this part of its counterclaim or seek to add Huaxia.

In sum, the fact that Awesome and Huaxia are necessary parties will not result in the dismissal of the counterclaims at this juncture. That issue may be revisited if Plymouth Rubber does not drop these limited claims and it is subsequently determined that this court lacks personal jurisdiction over Awesome and/or Huaxia.

### Customers Other Than Delphi

Yongle also contends that the customers who allegedly bought product directly from Yongle, in alleged violation of its Agreements with Plymouth Rubber, are necessary parties to the litigation. The question whether Delphi is a necessary party raises unique issues, which are discussed *infra*. However, Yongle has not established that the other customers are necessary parties.

■ Assuming, *arguendo*, that the sales to Staffco, Lear and Condumex were in violation of the Agreements, the conduct at issue is still Yongle's, and Yongle would be responsible for any damages that are awarded. These customers do not have an interest in this litigation. While they may want Yongle to continue to sell to them, they cannot affect whether Yongle is breaching its Agreements with Plymouth Rubber by selling to them. Thus, while Plymouth Rubber may obtain an injunction preventing Yongle from selling to other customers, at most these customers could seek damages from Yongle. These customers are not parties to the Yongle–Plymouth Rubber Agreements and there is no risk that Yongle will be subjected to inconsistent obligations. This court cannot envision a scenario where Yongle might be compelled to sell directly to Staffco, *et al.* if a court had found previously that such sales violated Yongle's exclusive sales agreement with Plymouth Rubber. The fact that Yongle may be subjected to multiple lawsuits (as opposed to inconsistent obligations) does not render the customers necessary parties. *See Delgado*, 139 F.3d at 3, and cases cited.

### Delphi

Yongle also contends that Delphi is a necessary and indispensable party. As de-

tailed above, all the claims against Delphi are being dismissed for lack of jurisdiction. Therefore, the analysis will be limited to the claims between Plymouth Rubber and Yongle.

To the extent that Plymouth Rubber's claims are limited to whether Yongle breached its contracts by selling directly to Delphi, Delphi is not a necessary party. Complete relief can be afforded with just Yongle. While Delphi may be interested in whether its arrangements with Yongle violate Yongle's Agreements with Plymouth Rubber, Delphi has no interest in those Agreements and cannot affect the outcome of that dispute. Whether the Yongle–Plymouth Rubber exclusive sales relationship remained in effect or was terminated due to Plymouth Rubber's failure to pay for goods delivered, or for any other reason, needs to be decided. Delphi is merely a significant witness in that dispute, not a necessary party. *See Haas v. Jefferson Nat'l Bank of Miami Beach*, 442 F.2d 394, 398 (5th Cir.1971) (party was indispensable only where he was "more than a key witness," and was "an active participant" in the alleged cause of action).

Moreover, the litigation of these claims without Delphi will not impede or impair Delphi's ability to protect its own interests. The rights and obligations of Delphi and Plymouth Rubber vis-à-vis each other are being litigated in Michigan.[9] Allowing the instant litigation to go forward without Delphi would not subject Yongle to a substantial risk of incurring inconsistent obligations. It appears that Yongle's goals are the same as Delphi's so it is unlikely that Delphi would sue Yongle after the Plymouth Rubber litigation is completed, regardless of the result. In any event, the possibility that the outcome of the Yongle–Plymouth Rubber litigation may result in

some subsequent litigation between Yongle and Delphi does not make Delphi a necessary party. *See Delgado*, 139 F.3d at 3 ("the mere possibility of inconsistent results in separate actions does not make the plaintiff in each action a necessary party to the other").

■ The analysis is different for Plymouth Rubber's claim against Yongle for civil conspiracy (Count XI). Therein, Plymouth Rubber contends that Delphi and Yongle "formed a conspiracy" to "misappropriate the Proprietary Product Line and Proprietary Information and arrange for Yongle to sell the Proprietary Product Line directly into the Western Hemisphere for purchase by Delphi and bypassing Plymouth." *PR Claim* ¶ 98. Admittedly, "[i]n a suit to enjoin a conspiracy not all the conspirators are necessary parties defendant." *State of Ga. v. Penn. R. Co.*, 324 U.S. 439, 463, 65 S.Ct. 716, 729, 89 L.Ed. 1051 (1945). Nevertheless, in the instant case, it is clear that Delphi has an interest in the subject of the action, and that, as a practical matter, allowing the instant litigation to proceed without Delphi would impair Delphi's ability to protect its interest, thereby making Delphi a necessary party under Fed.R.Civ.P. 19(a)(1)(B)(i).

As an initial matter, it is difficult to envision how the conspiracy claim can actually proceed without Delphi's involvement. Its alleged role is not simply that of a key witness, but one of "an active participant" in the alleged cause of action. *Haas*, 442 F.2d at 398. Moreover, a finding in the instant litigation that there was a conspiracy between Yongle and Delphi would impact the Michigan litigation. As the court found in *Picciotto*, where an attorney who allegedly engaged in a civil

---

9. Significantly, Yongle does not contend that it is a necessary party in Delphi's Michigan litigation. This is further support for the conclusion that Delphi is not a necessary party in Yongle's litigation with Plymouth Rubber.

conspiracy with defendant insurers against the plaintiff client was held to be a necessary and indispensable party:

> While the outcome of the federal litigation would not be binding on [the attorney] as res judicata if she were not a party to the case, an adverse ruling would nonetheless impair [the attorney's] ability to settle the state law claims [brought by the plaintiff client] against her. Settlement position is a valid consideration in the practical inquiry required by Rule 19(a)(2)(i) because, even without a direct preclusive effect, an adverse judgment could be persuasive precedent in a subsequent proceeding, and would weaken the absent party's bargaining position for settlement purposes.

*Picciotto*, 512 F.3d at 16 (internal quotations and punctuation omitted). Similarly, in the instant case, an adverse ruling against Yongle on the conspiracy claim could affect the settlement options in the Michigan litigation between Delphi and Plymouth Rubber. Therefore, Delphi is a necessary party.

This court further concludes that Delphi is an indispensable party under Rule 19(b), and that "in equity and good conscience" if the conspiracy claim remains, the case should be dismissed. Rule 19(b) lists the following four factors that the court should consider in determining whether a party is indispensable:

(1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;

(2) the extent to which any prejudice could be lessened or avoided by:

(A) protective provisions in the judgment;

(B) shaping the relief; or

(C) other measures;

(3) whether a judgment rendered in the person's absence would be adequate; and

(4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

"These factors implicate many of the same practical judgments required by the Rule 19(a) determination." *Picciotto*, 512 F.3d at 18, n. 13.

In the instant case, Delphi's interests in settling the Michigan litigation would be prejudiced if this case proceeded without it, thereby satisfying the first Rule 19(b) factor. *See Id.* at 18. As to the second factor, "it would be difficult if not impossible to shape relief that would not implicate [Delphi's] interests" since Plymouth Rubber's goal is to stop direct sales to Delphi. *Id.* (internal punctuation and quotations omitted). The third factor "also encompasses the interest of the courts and the public in complete, consistent and efficient settlement of controversies" and here it would be very inefficient to try a conspiracy claim without the principal co-conspirator. *See Id.* (internal quotations omitted). Finally, the fourth factor is satisfied. Plymouth Rubber could pursue its conspiracy claims in state court or through arbitration—as it has done with other related claims.

In sum, Delphi is an indispensable party with respect to the conspiracy claim. However, it cannot be joined as a party since its joinder would destroy diversity. Therefore, Plymouth Rubber must either drop its conspiracy claim, or the action will be dismissed.

### 3. *Adequacy of Plymouth Rubber's Claims*

Yongle has also moved to dismiss Plymouth Rubber's claims against it on the grounds that they fail on the merits. Basically, Yongle has asked that this court accept its version of events as true, and

conclude that it had the right to use the technology as it did, and that Plymouth Rubber failed in its marketing duties. *See Yongle Mem.* (Docket No. 19) at 18–20. Such a conclusion is not warranted on the existing record.

Yongle has not asserted a motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6), and such a motion would be unsuccessful since Plymouth Rubber has alleged sufficient facts to support its claims against Yongle. Moreover, the facts are in dispute at this juncture, and Yongle has not established that it is entitled to judgment as a matter of law. Therefore, the adequacy of the pleadings is not a basis to dismiss Plymouth Rubber's counterclaims. *See Green v. City of Boston*, 966 F.Supp. 117, 119 (D.Mass.1997) ("A motion to dismiss involves only a limited inquiry. The standard for granting the motion is not the likelihood of success on the merits, but rather, whether the plaintiff is entitled to offer evidence to support his or her claim."), *aff'd*, 132 F.3d 30 (1st Cir.1997).

## C. *Motion to Stay Pending Arbitration*

Yongle contends that Plymouth Rubber's counterclaims should be stayed pending arbitration. Thus, the Equity Agreement provides that "[a]ny dispute arising out of or in connection with this Agreement, including any questions regarding its existence, validity or termination" which cannot be resolved through "friendly consultations" "shall be submitted to the Hong Kong International Arbitration Centre ("HKIAC") to be arbitrated according to the Rules of Arbitration of the HKIAC." *Equity Agreement* (Bennet Decl. Ex. 12) at Article 86. The Technology Transfer Agreement incorporates the Equity Agreement's arbitration provision and makes it applicable to the Technology Agreement "and any Dispute hereunder" "[i]n an effort to resolve informally and amicably any claim or controversy arising out of or related to the interpretation or performance of this Agreement (including without limitation, issues of arbitrability, disqualifications, statutes of limitations, existence, validity and termination) (a 'Dispute'), without resorting to litigation[.]" *Technology Transfer Agreement* (Bennett Decl. Ex. 14) at Article 8.

Finally the Sales and Distribution Agreement provides as follows:

> Any disputes arising from the implementation of, or in connection with, this Agreement shall be settled through friendly consultations among the Parties. In case no settlement can be reached through consultations, the dispute shall be submitted to the Hong Kong International Arbitration Centre ("HKIAC") to be arbitrated according to its rules for international arbitration. Such arbitration shall be held in the Special Administration Region of Hong Kong, P.R. China. *Any party may, without waiving any remedy under this Agreement, seek from any court of competent jurisdiction any interim or provisional relief to protect its Confidential Information or intellectual property rights. For purpose of this Agreement, the Parties further confirm that the foregoing provision to grant a party [the right] to seek interim or provisional relief from a court of competent jurisdiction shall not be deemed as any plan, intent, acknowledgment or agreement among the Parties to resolve their dispute arising out of or in connection with this Agreement through court litigation.*

*Sales and Distribution Agreement* (Bennett Dec. Ex. 15) at § 9.2 (emphasis added). These provisions require that Plymouth Rubber's counterclaims be arbitrated.

■ Section 3 of the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* ("FAA"), provides as follows:

If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3. Therefore, the staying of an action is mandatory "where that action involves an issue intended by the parties to be resolved through arbitration[.]" *Bowlby v. Carter Mfg. Corp.*, 138 F.Supp.2d 182, 186 (D.Mass.2001).

■ The FAA reflects "a strong federal policy favoring arbitration[.]" *Id.* at 187. Where the parties have entered into a contract containing an arbitration clause, "there is a presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.'" *AT & T Techs., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 650, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 (1986) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960)). On the other hand, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Id.* at 648, 106 S.Ct.

at 1418 (quoting *Warrior & Gulf Navigation Co.*, 363 U.S. at 582, 80 S.Ct. at 1353). "Thus, a party seeking to substitute an arbitral forum for a judicial forum must show, at a bare minimum, that the protagonists have agreed to arbitrate *some* claims." *McCarthy v. Azure*, 22 F.3d 351, 354–55 (1st Cir.1994).

■ "In order to stay court proceedings pursuant to § 3, this Court must find that 1) there exists a written agreement to arbitrate, 2) the dispute in question falls with[in] the scope of that agreement, and 3) the party seeking arbitration has not waived its right to arbitration." *Bowlby*, 138 F.Supp.2d at 186–87 (citing *Brennan v. King*, 139 F.3d 258, 263–67 (1st Cir. 1998)). Applying these principles to the instant case mandates that this matter be stayed pending arbitration.

■ Plymouth Rubber contends that Yongle breached the terms of Article 78 of the Equity Agreement by misusing Plymouth Rubber's intellectual property, but that the dispute is not subject to arbitration because there is no express reference in either the Equity Agreement or the Technology Transfer Agreement to arbitration of disputes between Yongle and Plymouth Rubber. *See PR Opp.* (Docket No. 28) at 17–18. This court disagrees. Even though Yongle is not a signatory to the Equity Agreement, the arbitration provision controls this dispute. Yongle was created as a result of the Equity Agreement. Moreover, Plymouth Rubber is seeking to enforce the Equity Agreement against Yongle. Since the Arbitration provision covers the types of claims Plymouth Rubber is asserting, it does not matter that Yongle is not a signatory to the Equity Agreement. *See Sourcing Unlimited, Inc. v. Asimco Int'l, Inc.*, 526 F.3d 38, 47 (1st Cir.2008) ("Federal courts have been willing to estop a *signatory* from avoiding arbitration with a nonsignatory when the

issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed") (internal quotations omitted)), and cases cited.

Similarly, the Technology Transfer Agreement, to which Yongle is a party, expressly makes the Equity Agreement's arbitration provision applicable to disputes under the Technology Transfer Agreement. Despite Plymouth Rubber's claim that this incorporation was limited to the signatories of the Equity Agreement, there is no indication whatsoever that the arbitration provision in the Technology Transfer Agreement would be applicable to only some of the signatories to that Agreement. Moreover, such a reading would make no sense since the arbitration provision applies to "any claim or controversy arising out of or related to the interpretation or performance of" the Technology Agreement. *Technology Transfer Agreement* at Article 8. Finally, the Sales and Distribution Agreement, which is also at issue here, expressly requires disputes thereunder to be arbitrated, and Yongle is a party to that Agreement. There is no merit to the contention that the arbitration provisions do not apply to Yongle.

Plymouth Rubber also contends that its claim for injunctive relief should not be sent for arbitration under the provision of the Sales and Distribution Agreement which allows a party to seek "interim or provisional relief to protect its Confidential Information or intellectual property rights" from a court of competent jurisdiction. *Sales and Distribution Agreement* at § 9.2. The fact that Plymouth Rubber has never sought preliminary relief despite the fact that this case has been pending for more than a year,[10] makes it virtually impossible for it to claim that it would suffer irreparable harm absent an injunction. *See Read Corp. v. Powerscreen of Am., Inc.,* 26 F.Supp.2d 204, 206 (D.Mass.1998), and cases cited. There is no basis to keep the issue of preliminary relief here while sending the balance of the case to arbitration.

■■ Finally, Plymouth Rubber contends that Yongle has waived its right to claim arbitration by filing suit here and participating in some voluntary discovery while the motion to dismiss has been pending. Admittedly, "[d]espite the policies favoring arbitration of contractual disputes, it has long been held that parties are free to waive their rights to arbitration under a contract and proceed to present their contractual dispute to a court. Moreover, such a waiver need not always be express; rather, courts can infer a waiver from the circumstances." *Jones Motor Co., Inc. v. Chauffeurs, Teamsters & Helpers Local Union No. 633 of N.H.,* 671 F.2d 38, 42 (1st Cir.1982) (internal citations omitted). On the other hand, courts should not be "overready to find a waiver." *Id.* (citation omitted). In the instant case, there was no waiver.

Yongle brought suit in the instant case under the Consignment Agreement, which does not contain an arbitration provision. In response to the counterclaims filed by Plymouth Rubber, Yongle immediately contended that Plymouth Rubber's claims were subject to arbitration. As detailed above, Plymouth Rubber's counterclaims are permissive. Thus, unlike *Gutor Int'l AG v. Raymond Packer Co., Inc.,* 493 F.2d 938 (1st Cir.1974), on which Plymouth Rubber relies, Yongle's claims are not so intertwined with the arbitrable claims that

---

**10.** During much of the time that this case has been pending, the parties were engaged in settlement discussions. For example, rulings on the motions to dismiss were stayed pending attempts to settle. The parties notified this court in September 2009 that the motions were ripe for resolution, at which time there was further briefing and argument.

it would be "unconscionable" to allow Yongle's claims to go forward in court, while Plymouth Rubber's claims go forward in arbitration. *Id.* at 945. In any event, Yongle has agreed to submit its claims to arbitration if Plymouth Rubber's claims are found arbitrable. *See Reply Bennett Decl.* at ¶ 6.

Finally, to the extent that Yongle engaged in limited discovery, it did so without waiving its rights to arbitration and in order to avoid court involvement when faced with Plymouth Rubber's demand for discovery. *Id.* at ¶¶ 7A–L. The facts here do not indicate that Yongle waived its rights to compel arbitration. The arbitration provisions are in effect and govern Plymouth Rubber's claims.

## IV. *CONCLUSION*

For all the reasons detailed herein:

(1) Delphi's Motion to Dismiss (Docket No. 24) is ALLOWED;

(2) Yongle's Motion to Stay Litigation of Counterclaims Pending Arbitration, and to Compel Arbitration (Docket No. 17) is ALLOWED; and

(3) Yongle's Motion to Dismiss (Docket No. 17) is DENIED WITHOUT PREJUDICE. If Plymouth Rubber fails to amend its counterclaims in accordance with this decision within thirty (30) days from the date the stay referenced above is lifted, Yongle may renew its motion to dismiss for failure to join an indispensable party.